**Gary RICCIO, Plaintiff–Appellant,**

v.

**COUNTY OF FAIRFAX, VIRGINIA; J. Hamilton Lambert; John E. Granfield, Chief; the Board of Supervisors of Fairfax County, Defendants–Appellees.**

No. 89–2399.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 11, 1990.

Decided July 12, 1990.

**1460**

Peter David Greenspun, Klein & Greenspun, Fairfax, Va. (Sarah Deneke, Klein & Greenspun, Fairfax, Va., on the brief), for plaintiff-appellant.

David John Fudala, Hall, Markle, Sickels & Fudala, P.C., Fairfax, Va., for defendants-appellees.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

Discharged Fairfax County Police Officer Gary Riccio brought an action pursuant to 42 U.S.C. § 1983, alleging that the process by which the decision to discharge him was made violated his procedural due process rights under the Fourteenth Amendment of the United States Constitution. Riccio named as defendants the County of Fairfax, Virginia, Fairfax County Executive J. Hamilton Lambert, Fairfax County Police Department Chief of Police John E. Granfield, and the Board of Supervisors of Fairfax County. After a hearing on motions for summary judgment brought by all the parties, the district court granted summary judgment in favor of the defendants. Riccio has appealed.

I.

On June 24, 1987, Ann Elizabeth Stark contacted the Fairfax County Police Department ("the Department") to report that she believed that Riccio had made several obscene phone calls to her. Stark had tape recorded two of the calls. That evening, Stark informed Riccio's supervisor, Lieutenant Phillip Lively, that she received the alleged calls on June 21, 1987, and June 24, 1987. Stark apparently knew Riccio, first becoming acquainted with him when she was in high school and he, while on duty, would spend time on school grounds. The two apparently had subsequent encounters.

Lively immediately contacted the Department's Internal Affairs Section, which assigned Sergeant Steven Hardgrove to investigate the matter. Later that evening, Hardgrove contacted Riccio and interviewed him at some length. At the interview, Riccio denied making the calls. Riccio acknowledged that he knew Stark and that he first met her while she was in high school. He told Hardgrove that the relationship he established with Stark and other high school students was for the purpose of improving the image of the police department generally and establishing himself as a police officer to whom they could turn. He also informed Hardgrove that he was visiting his parents in Pennsylvania on June 21, the first day of the alleged calls to Stark, and he provided Hardgrove with specific information regarding his activities on June 24, the second day of the alleged calls to Stark.

After the interview, at 1:00 a.m. on June 25, Hardgrove informed Riccio that he was relieved of duty, with pay, pending further investigation of the matter. Also on June 25, Riccio received written notice that he was being investigated for violating Department Regulations 201.3 (governing obedience to laws and regulations) and 201.7 (governing standards of conduct).[1] Hardgrove instructed Riccio not to discuss the investigation with anyone.

1. Subsequent memoranda, including one dated June 25 from the Commander of Internal Affairs to the Chief of Police, and one dated June 29 from the Deputy Chief of Police to the Chief of Police, indicate that the second charge was eventually dropped.

As Hardgrove proceeded with his investigation, he learned that earlier in 1987, a woman named Jennifer Dundas had accused Riccio of making obscene phone calls to her. Although the record is not clear, it appears that Dundas decided not to pursue a formal complaint and the Department did not make any formal charges. Although, in his brief before us, Riccio claims that he was "cleared of all allegations of making obscene phone calls" to Dundas, there is no such indication in the record. Indeed, the report of Lt. Lively, who investigated the Dundas incident, states that Riccio admitted to calling Dundas, although he characterized the call as a practical joke.

Shortly after Riccio's suspension, several other relevant events occurred. According to Cheryl Beaudoin, a police dispatcher in Vienna, Virginia, Riccio informed Beaudoin, on June 25, of the charges pending against him.[2] On July 7, the Department conducted a polygraph exam on Riccio. Riccio contends that the Department ordered him to take the exam and in deposition testimony Hardgrove conceded that his directive was probably construed as an order. However, it is also true that the idea of taking a polygraph was first proposed by Riccio on the night of his suspension.[3] Fairfax County Police Investigator Guy Morgan administered the exam and concluded that Riccio was "deceptive" in his responses.

Hardgrove and Riccio met on July 2 and July 16. At the latter meeting, the two discussed the polygraph results and Riccio's communications to Beaudoin, of which Hardgrove had learned. Hardgrove played a portion of the tape that Stark had provided, which prompted Riccio to state, "It sure sounds like me."[4]

On July 22, Hardgrove presented Chief of Police John E. Granfield with his report. That report recommended that Riccio be held in violation of Regulation 201.3 (governing obedience to laws and regulations) as it pertains to Va.Code Ann. § 18.2–427 (proscribing obscene phone calls); Regulation 201.20 (governing truthfulness) for contradicting himself in his description of events with respect to the Dundas complaint; and Regulation 205.1 (governing insubordination) for discussing the investigation with Beaudoin notwithstanding the order not to discuss the matter with anyone. The recommendations were concurred in by Lt. Daniel J. Kerr of the Internal Affairs Section. In addition to providing the evidence against Riccio, the report provided Riccio's explanation for his interaction with the high school students; Riccio's characterization of the call to Dundas; the fact that Riccio made only one conflicting statement in the pre-polygraph test interview; Riccio's responses when asked to explain the polygraph results; the fact that Beaudoin, who had heard the Stark tape, concluded that the voice on the tape was "definitely not" Riccio's; and the fact that Riccio generally maintained his innocence throughout. The report did not include the alibi evidence presented by Riccio to Hardgrove regarding the fact that he was in Pennsylvania on June 21 or that he claimed he could account for his activities on June 24. Nor did the report indicate any investigation of Riccio's alibi evidence.[5]

On August 7, a meeting was held between Riccio, Hardgrove, Captain Rappaport (Riccio's immediate supervisor), and Major Edward A. Stevens (Commander of the Patrol Bureau). The defendants contend, and Riccio does not deny, that Riccio was given the opportunity to present his

2. Beaudoin's statement is ambiguous as to if and when Riccio informed her of the name of the woman who lodged the complaint against him.

3. Riccio's "proposal" was somewhat in passing. He said, ". . . and I did not call Ann Stark, and whatever you need to do, polygraph me or whatever, that will just prove I didn't do it."

4. Riccio claims that he "asked if he should retain an attorney [and that] Sergeant Hardgrove then told Officer Riccio that an attorney would not be necessary until after termination, if that was the result of the investigation." However, the record reveals that Hardgrove's response, to the extent it was recalled at all, was not nearly so definite.

5. For example, there was no indication of an interview of Riccio's parents to see if he was indeed at their house on June 21.

side of the story at the meeting. Through-out the meeting, reference apparently was made to the Hardgrove report of which Riccio was not provided a copy (although there is no indication that he asked to see it). In the record before us, there is an Internal Affairs Routing Slip signed by Major Stevens on August 6, the day before the meeting, which reads: "Concur with [Internal Affairs] findings. Recommend termination on 8/7/87 after hearing."

Major Stevens found Riccio in violation of Regulation 201.3, Regulation 201.20, and Regulation 205.1. He concluded that he would recommend that Riccio be terminated. Major Stevens formalized those conclusions in a memorandum, dated August 7 and signed by Riccio. The memorandum further advised Riccio as follows:

> You may make a written reply to my recommendation within ten business days of your receipt of this letter. This reply is not an appeal.
>
> You have ten business days to appeal this recommendation under General Order 305.4 or 305.5. Failure to respond will be an indication that you waive your right to appeal.

At oral argument, counsel for the defendants informed us that Riccio's pay was cut off on August 7.

After receiving Major Stevens' recommendation, Riccio obtained counsel. Through his attorneys, he elected to challenge Major Stevens' conclusion pursuant to Section 305.4 of the Department's General Orders. The process required the appointment of a three-member Hearing Panel, one member to be selected by Riccio, one member to be selected by the Department, and one member to be selected by the first two members. The member selected by the Department served as chair. According to General Order 305.4, Article IX, the findings of the Hearing Panel are to be "given significant weight but are advisory and not binding upon the Chief of Police."

The Hearing Panel convened and conducted evidentiary hearings on September 22, 23, 30, and October 1. The Department presented essentially the evidence relied upon in the Hardgrove report. That evidence included the Hardgrove report itself, the testimony of Stark, Dundas, Lt. Lively, Hardgrove, and, without objection, Morgan (the polygraph examiner). Riccio presented character witnesses, witnesses who knew Riccio's voice and did not believe that the caller on the Stark tape was Riccio, a polygraph expert who disagreed with one of Morgan's five findings of deception and a voice expert who did not believe the voice on the Stark tape was Riccio's. The Department presented the rebuttal testimony of FBI Agent Bruce Koenig who challenged the method used by Riccio's expert in reaching his conclusions.[6]

On October 1, after two and one-half hours of deliberation, the Hearing Panel sustained the charges against Riccio and recommended termination. Lorenzo Williams, the panel member selected by Riccio, dissented. The next day, Chief of Police Granfield reviewed the Hearing Panel's findings and informed Riccio that he was "terminating [Riccio's] employment" effective that day.

Riccio then pursued further appeal rights secured by General Order 305.4. Pursuant to the order, Riccio appealed Chief Granfield's decision to Fairfax County Executive J. Hamilton Lambert. Lambert ordered the appointment of a Special Police Hearing Panel ("SPHP"), which was to conduct a *de novo* inquiry without seeing the Hardgrove report.

The SPHP convened on November 16. The parties presented essentially the same evidence as was presented to the first Hearing Panel, with the exception of the Hardgrove report, which the SPHP did not see. On November 23, the SPHP announced its unanimous conclusion that the charges against Riccio should be sustained. The SPHP identified ten evidentiary bases

---

6. There is disagreement between the parties as to the quality of the tape used by Riccio's expert and as to whether the FBI would have performed a voice analysis if the Department had requested it. As will be shown *infra,* we need not resolve those factual disputes for purposes of the case.

for its conclusion. The SPHP further recommended that Riccio be dismissed. On November 25, Lambert "accepted" the SPHP's "findings and the recommendation of dismissal."

Riccio then brought this § 1983 action. Riccio's complaint alleged that he was terminated without due process of law. The defendants' answers asserted five grounds of defense including failure to state a claim upon which relief can be granted; sovereign immunity; failure to comply with mandatory statutory procedures; waiver; and that Riccio's employment was terminated for just cause. In addition, defendants Granfield and Lambert asserted the defense of qualified immunity.

After a hearing on summary judgment motions brought by all parties, the district court found that Riccio's constitutional rights had not been violated. In so holding, the district court measured the process received by Riccio directly against constitutional standards, holding that any possible violations of state statutes or regulations were of no constitutional significance. The district court mentioned, but issued no holding as to, the defendants' qualified immunity defense.

Riccio has appealed, alleging two bases of district court error. First, Riccio contends that the district court erred in finding that the process Riccio received satisfied the federal standard of due process. Second, Riccio contends that the district court erred in holding that alleged violations by the defendants of state law were not relevant to Riccio's due process claim. We consider Riccio's arguments in turn.

## II.

In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that when a state has created a property interest in employment, the process by which a decision to terminate that employment is made must satisfy the requirements of the procedural prong of the Due Process Clause of the Fourteenth Amendment. Specifically, the Court held that some form of pretermination hearing is required, *see* 470 U.S. at 542, 105 S.Ct. at 1493, but that hearing "need not be elaborate." *See id.* at 545, 105 S.Ct. at 1495. The Court held that the employee facing termination "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* at 546, 105 S.Ct. at 1495 (citation omitted). Our inquiry must therefore focus on whether Riccio received oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story before he was terminated. For the reasons set forth below, we agree with the district court that Riccio received those procedural protections.[7]

### A

■ Before discussing the specific process deficiencies that Riccio alleges, we note that the record reveals a considerable amount of process leading up to Major Stevens' August 7 decision. First, Riccio had four opportunities to present his side of the story. He discussed the matter with Hardgrove on June 24, July 2, and July 16 and with Major Stevens on August 7. The discussions with Hardgrove gave Riccio the opportunity to persuade Hardgrove, the internal affairs report author, that he had committed no wrong. In addition, Hardgrove included much of the information favorable to Riccio in his report. The

---

7. There is considerable confusion as to the designation of the date on which Riccio was terminated. On the pleadings, both parties took the position that November 25 was the date of termination; Riccio subsequently has claimed that it was really August 7 and the defendants have claimed it was really October 2. Rather than undertaking resolution of the dispute, we simply assume that Riccio was terminated on August 7. We can do this because even if August 7 is the termination date, the pretermination process received by Riccio satisfies the *Loudermill* standard.

meeting with Major Stevens gave Riccio a chance to influence the man who would make the crucial August 7 decision.

Nor is there any indication that the Department was indifferent as to the accuracy of its decision on Riccio's termination. Hardgrove interviewed Stark, Dundas, and Beaudoin. The record also includes a memorandum on the matter from Lt. Lively to Chief Granfield, including a reference by Lt. Lively to "Officer Riccio's general level of excellent job performance" during the months preceding the Dundas affair. Moreover, prior to its submission to Major Stevens, the Hardgrove report was reviewed and sustained by Lt. Kerr, adding a layer of internal review as a pretermination check on bias that would be detectable from the face of the report. Finally, and most importantly in our view, Riccio met with Major Stevens prior to the August 7 decision. Given that Riccio's pretermination process "need not be elaborate," *Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495, and should merely serve as "an initial check against mistaken decisions," *see id.* at 545–46, 105 S.Ct. at 1495, we find that the abundance of process received by Riccio establishes a formidable presumption working against Riccio's allegations of specific process deficiencies.

## B

Riccio calls our attention to several alleged inadequacies of the process leading up to the termination decision. We conclude that, although there were instances where the Department could have treated Riccio more fairly, none of the alleged procedural defects to which Riccio points indicates a violation of the *Loudermill* standard.

■ Riccio claims that the Hardgrove report had several deficiencies. First, it did not include Riccio's alibis for the times at which Stark received the obscene phone calls. Second, it discussed the Dundas affair, which, Riccio claims, was not to be part of the investigation of the Stark affair. Riccio argues that the alleged defects

in the Hardgrove report were compounded by the fact that he was not provided with a copy of the report.

■ Although it quite possibly would have been to Riccio's benefit if the Hardgrove report was handled the way Riccio argues it should have been handled, *Loudermill* does not impose on the government employer the burden to perform all pretermination acts that could benefit the employee subject to discharge. Riccio had the opportunity to present his alibi evidence at the August 7 meeting. Furthermore, given that Hardgrove had discussed the Dundas incident with Riccio at their July 16 meeting, it should have come as no surprise to Riccio that the Hardgrove report discussed the incident.[8] Again, Riccio had the opportunity to present his version of events at the August 7 meeting. As for the fact that Riccio was not provided a copy of the Hardgrove report, we do not read *Loudermill*'s requirement that the government employer inform the employee facing discharge of the evidence against him to obligate the government to provide the employee with internal employer documents for which the employee has not asked. Although such an action might further the interests of fairness, the Due Process Clause does not require it.

■ Riccio points also to the August 6 Internal Affairs routing slip on which Major Stevens noted his intention to recommend Riccio's discharge after the meeting to be held the next day. The prospect of bias on the part of Major Stevens is of consequence, especially in light of the fact that we rely in part on Riccio's access to Major Stevens as a basis for discrediting Riccio's claim of defect in the Hardgrove report. However, we think it inaccurate to characterize Major Stevens' predisposition as "bias" on the basis of the record before us. Instead, Major Stevens' intention probably represented his assessment of the evidence presented in the Hardgrove report. There is nothing in the record to suggest that Major Stevens would have refused

---

**8.** This is particularly so in light of the fact that the Dundas incident involved the kind of action of which Riccio was accused in the Stark incident.

fairly to consider exculpatory evidence presented by Riccio during the August 7 meeting. The mere fact that the Hardgrove report had suggested an outcome to Major Stevens does not constitute a due process violation. *See Buschi v. Kirven,* 775 F.2d 1240, 1256 (4th Cir.1985) (decisionmaker's "forecast of the outcome of the [equivalent of a hearing] did not foreclose the plaintiffs' rights [to pretermination hearing]").

■ Riccio also argues that he "was not given the specifics of the charges [against him] until the pretermination hearing was over." Appellant's Brief at 18. It is true that Riccio received written notice only of his alleged violation of one count of Regulation 201.3 ("obedience to laws"). However, over the course of his meetings with Hardgrove, we believe Riccio received effective notice of the other charges against him. Specifically, Riccio was alerted to the facts that Hardgrove believed that Riccio had violated the order that he not discuss the investigation with anyone, that Hardgrove believed Riccio had given conflicting accounts of the Dundas incident, and that the Department was examining the Dundas incident. Particularly in light of the fact that Riccio was on full notice as to the count of obedience to laws related to the Stark phone calls, we believe Riccio received effective notice as to the other charges, all of which were closely related to the charge based directly on the Stark incident.[9] Riccio had full opportunity to present his side of the story as to all of these charges on various occasions, including the August 7 meeting with Major Stevens.

Riccio advances several other arguments which fail to make out violations of the

*Loudermill* standard. Riccio alleges error in the defendants' failure to provide Riccio with a first generation copy of the Stark recording. He also complains that the defendants withheld pre-hearing inconsistent statements of the Department's witnesses. Riccio also charges that the use of a polygraph examination was constitutional error. Finally, Riccio claims error in his alleged inability, under the Virginia statutory and regulatory scheme, to present his side of the story to the ultimate decisionmaker.

■ None of those arguments is convincing. A government employee facing possible termination simply is not entitled to all of the rights of a criminal defendant. Thus, Riccio's reliance upon *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and Virginia cases finding polygraph test results inadmissible in a criminal proceeding, *see, e.g., Taylor v. Commonwealth,* 3 Va.App. 59, 348 S.E.2d 36 (1986), is misplaced.[10] Finally, in light of the *Loudermill* Court's explicit decision not to apply the standard of *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), in the pretermination hearing context, we find Riccio's reliance upon that case to establish his right to an in-person encounter with the ultimate decisionmaker unpersuasive. *See Loudermill,* 470 U.S. at 545–46, 105 S.Ct. at 1495 (*Goldberg* "presented significantly different considerations than are present in the context of public employment"). In any event, Riccio in fact met with Major Stevens, the man who made the August 7 decision. Accordingly, we hold that the process Riccio received complied with the *Loudermill* standard.

**9.** There is some confusion as to whether the two counts of obedience to laws arise from the two days on which calls were made to Stark (each day constituting a count) or from the Dundas incident and the Stark incident (each incident constituting a count). Indeed, Riccio relies upon the confusion to demonstrate the inadequacy of the process he received. However, where, as here, Riccio was fully aware of both counts no matter how they are construed, we find no constitutional violation.

**10.** Nor do we consider ourselves bound by *Department of Public Safety v. Scruggs,* 79 Md.App. 312, 556 A.2d 736 (1989), which held that Maryland administrative law prohibits use of polygraph results even under the relaxed evidentiary standards of an administrative proceeding. Moreover, we note that the *Scruggs* court applied a harmless error analysis which would substantially weaken Riccio's position even if we were to adopt *Scruggs'* prohibition of use of polygraph evidence.

**1466**

### III.

■ Riccio alleges violations of the portion of the Virginia State Code governing "Law–Enforcement Officers' Procedural Guarantees" and the "General Orders" provided in the Fairfax County Police Manual.[11] He contends that the alleged violations constitute a federal due process violation. The district court held that violations of state law do not necessarily violate the Due Process Clause.

■ The Due Process Clause regulates the manner in which a state deprives its citizens of interests in life, liberty, and property. *See* U.S. Const. amend. XIV, § 1. It is well established that the mere existence of a state rule does not necessarily create an interest protectable by the Due Process Clause, and that, therefore, a state does not necessarily violate the Constitution every time it violates one of its rules. *See, e.g., Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983). Riccio's claim presents a slightly different problem in that his property right in employment is established independently of the procedural rules he claims were violated.[12] Therefore, he does not ask us to hold that a state violates the Due Process Clause every time it violates one of its rules. Instead, Riccio presents the question of whether the Due Process Clause compels compliance with state laws regulating the deprivation of a property interest where those laws call for more process than the Due Process Clause would otherwise require.

Although it does not appear to us that the Supreme Court has decided this issue,[13] several circuits have held that violations of state rules are not necessarily violations of the Due Process Clause even where those rules regulate the deprivation of a property or liberty interest whose existence is established. *See Bills v. Henderson,* 631 F.2d 1287, 1298 (6th Cir.1980); *Slotnick v. Staviskey,* 560 F.2d 31, 34 (1st Cir.1977), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). Our circuit confronted the issue in *Kersey v. Shipley,* 673 F.2d 730 (4th Cir.), *cert. denied,* 459 U.S. 836, 103 S.Ct. 80, 74 L.Ed.2d 77 (1982), which involved allegations of violation of the very statute that Riccio claims was violated. There, we framed the issue as follows:

> Virginia policemen have "a 'legitimate claim of entitlement to continued employment' at least to the extent that [the Law–Enforcement Officers' Procedural Guarantees statute] furnishes insurance against arbitrary employment actions." Thus, Kersey and Freeman were denied due process under the Fourteenth Amendment *only if they were deprived of the benefits conferred by Va.Code § 2.1–116.1 et seq. (1979).*

673 F.2d at 732 (emphasis added) (citations omitted). Later in the opinion we stated that "the scope of the property interest in continued employment with the Chesapeake Police Department is defined by the [state statutory] Law–Enforcement Officers' Procedural Guarantees...." *Id.* at 732–33. We then examined the record and found that the state statute had not been violated. *See id.* We concluded that there was no violation of due process. *See also Suddarth v. Slane,* 539 F.Supp. 612, 621 (W.D.Va.1982) ("*Since* the provisions of the grievance statute were complied with in both of the above instances, the Court finds

---

**11.** Riccio alleges violation of, among other things, Va.Code § 2.1–116.4, which provides that prior to dismissal, an officer "shall be notified *in writing* of all charges, *the basis therefor,* and the action which may be taken" (emphasis added), and General Order 305.4, which requires that if a dismissal is to take place, the employee is entitled to advance written notice, ten days prior to the effective date of the dismissal, including "a statement of previous offenses, if any, which have been considered in arriving at the proposed disciplinary action." Riccio also alleges that Va.Code § 2.1–116.5(2), providing merely that the chief of police is entitled to select a member of the trial board, is violated by General Order 305.4 which provides that the member of the trial board appointed by the chief of police shall be the *chairman.*

**12.** The defendants do not dispute the existence of Riccio's property right in his employment.

**13.** *See Davis v. Scherer,* 468 U.S. 183, 193 n. 11, 104 S.Ct. 3012, 3018 n. 11, 82 L.Ed.2d 139 (1984) (in a case with somewhat similar facts, noting that the question of whether "the procedural rules in state law govern the constitutional analysis" was not presented).

that [the plaintiff] was not denied due process under the Fourteenth Amendment.") (emphasis added).

One could, perhaps, argue that *Kersey* should be read as binding us to conclude that the Department violated the Due Process Clause if it violated Virginia laws and regulations when discharging Riccio. For several reasons, however, we decline to do so. First, we note that we did not actually find a violation of the state statute in *Kersey*. Therefore, we never had to decide what constitutional effect we would have given to a finding that the statute had been violated. That aspect of *Kersey*'s posture militates heavily in favor of exercising caution before reading *Kersey* as making the expansive holding that violations of state statutes designed to regulate the manner in which states deprive citizens of property rights necessarily violate the Due Process Clause. The fact that such a holding would have put our circuit into conflict with other courts renders the need for caution even more compelling.

In addition, *Kersey* predated the Supreme Court's decision in *Loudermill*. In *Loudermill*, the Court emphatically rejected the bitter-with-the-sweet logic which reasons that "where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of [the claimant] must take the bitter with the sweet." *See Arnett v. Kennedy*, 416 U.S. 134, 153–54, 94 S.Ct. 1633, 1644, 40 L.Ed.2d 15 (1974) (plurality opinion of Rehnquist, J.). Under the bitter-with-the-sweet logic, a state should be entitled to define the procedures by which it deprives its citizens of property interests because, after all, the state was free not to create the property interests in the first place. In *Loudermill*, the Court responded to a state's attempted assertion of the bitter-with-the-sweet logic as follows:

> [I]t is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today. The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards."

> In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." The answer to that question is not to be found in the [state] statute.

470 U.S. at 541, 105 S.Ct. at 1493 (citations omitted).

At first, it is tempting to conclude that, by rejecting the bitter-with-the-sweet approach, *Loudermill* holds that state-created procedures are irrelevant for purposes of the inquiry into what process is due. If this were so, *Loudermill* would overrule *Kersey* to the extent *Kersey*'s language implies that we would have found a constitutional violation if the state statute had been violated. However, in *Loudermill*, the Court confronted a state statute that provided for *less* process than what the Constitution would otherwise require. Here, we confront (and in *Kersey* we confronted) a statute that provides for *more* process than what the Constitution would otherwise require. The difference may be of some significance for two reasons. First, given that, under the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the burden that additional procedures would impose on a state is the primary reason for a federal court *not* to require additional procedures, the fact that the Virginia state legislature, which is in a far better position than we to make such judgments, found the burden of such additional procedures to

be minimal enough to justify their enactment is not to be taken lightly. Indeed, it would be somewhat bizarre for a court to limit the imposition of procedures for fear of "intrud[ing] to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee," *see Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495, if the state had imposed those procedures upon itself. Moreover, the fact that federal courts do not defer to the state's assessment of administrative burdens in situations in which the state-legislated procedures fall below the constitutional minimum does not logically require symmetrical nondeference when the state legislates procedures that exceed the constitutional minimum. A federal court's healthy distrust of a legislature that may be short-changing its citizen's constitutional rights compels nondeference in the former case but is not implicated in the latter case. Thus, we believe that it is not clear that claimants must *necessarily* accept the bitter with the sweet of *Loudermill*'s rejection of the bitter-with-the-sweet approach.

Supplementing our observation that rejection of the bitter-with-the-sweet approach does not necessarily compel rejection of *Kersey*'s implied holding is the fact that, although *Loudermill* delivered the knock-out blow, the bitter-with-the-sweet approach was, at best, staggering at the time we wrote *Kersey*. *See Vitek v. Jones*, 445 U.S. 480, 491, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1980) (the minimum requirements of the Due Process Clause "being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action."). Thus, given that *Loudermill* does not *necessarily* overrule *Kersey*'s implied holding, it would be unreasonable to find that *Loudermill*'s general theory overrules *Kersey* in light of the fact that *Loudermill*'s general theory had already been expressed by the Supreme Court at the time we decided *Kersey*.

However, although we are not willing to hold that *Loudermill*'s rejection of the bitter-with-the-sweet approach overrules *Kersey*, the emphatic nature of such a rejection is another factor counseling against uncritically accepting as binding precedent *Kersey*'s implication that a violation of the state statute would have necessarily led to a violation of the Due Process Clause.[14] Moreover, *Loudermill* provided us with a fully elaborated statement of the kind of process due when a public employee with a property interest in his job is discharged. There is uncertainty as to whether, in *Kersey*, we would have granted to the state statute, which provides more process than that specified by the *Loudermill* Court, as prominent a role in our analysis if we had had the benefit of the *Loudermill* holding.

In light of the foregoing considerations, we decline to read *Kersey* as implying a holding that is binding upon us. In fact, we conclude that, contrary to what we may have implied in *Kersey*, the Department's violation of the Law–Enforcement Officers' Procedural Guarantees does not necessarily compel a finding of a due process violation. As noted above, we concede that it is at least awkward to find that procedures the state, through its legislative body, has imposed upon itself would be unduly burdensome for the state. However, in addition to Riccio's interest in retaining his employment and the state's interest in expeditious discharges, we must consider the incremental reduction in the risk of an erroneous deprivation attendant to any additional procedures we consider requiring. *See Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903; *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 14, 99 S.Ct. 2100, 2107, 60 L.Ed.2d 668 (1979). As the facts of this case amply demonstrate, the mere fact that a state enacts an entitlement to a procedure does not mean that the procedure so created inevitably reduces the like-

---

**14.** We note that, despite the Supreme Court's statement in *Vitek, supra,* our statement in *Kersey* that "the scope of the property interest in continued employment with the Chesapeake Po- lice Department is defined by the Law–Enforcement Officers' Procedural Guarantees," 673 F.2d at 732–33, is suggestive of the bitter with the sweet approach to procedural due process.

lihood of an erroneous deprivation to a point warranting constitutional recognition. Assuming for the moment that Riccio's allegations of violation of state law are correct, compliance with those procedures would have provided Riccio with notice in writing and would have formally alerted him that the Dundas incident would be used against him. However, as we noted above, Riccio already had effective notice of the charges against him and the possible use of the Dundas incident. Because the allegedly violated procedures here at issue would not have affected the likelihood of a proper resolution of Riccio's case to any appreciable extent, violation of those procedures is of no constitutional moment.

Moreover, to hold that a state violates the Due Process Clause every time it violates a state-created rule regulating the deprivation of a property interest would contravene the well recognized need for flexibility in the application of due process doctrine. *See Mathews v. Eldridge*, 424 U.S. at 334, 96 S.Ct. at 902; *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1953) (Frankfurter, J., concurring). Were we to adopt such a rule, we would become handcuffed, compelled to find constitutional violations where we, if not confronted by binding authority, otherwise would not, simply because a state has decided to enact, yet not in a trivial way to apply, a procedure. Although procedural due process doctrine does rely upon state law to a large extent by looking to state law for the origin of protectable interests, *see Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976), the rule proposed by Riccio would effectively force us to defer to the states on the ultimate issue of whether there has been a violation of the Constitution. Such a result

would be untenable and we therefore decline so to hold.[15]

Therefore, to terminate any doubt that may remain, we state that *Kersey*'s implication is not good law. Alleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures, even when those state-created procedures exceed the amount of process otherwise guaranteed by the Constitution. If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.[16]

The judgment of the district court is

AFFIRMED.

---

**15.** There is no inconsistency between our holding and *Detweiler v. Virginia Dep't of Rehabilitative Serv.*, 705 F.2d 557 (4th Cir.1983), upon which Riccio attempts to rely. In *Detweiler*, we commented that "an agency is required to comply with its regulations *that are congruent with the requirements of constitutional due process.*" 705 F.2d at 561 (emphasis added). If anything, *Detweiler* works against Riccio in that it appears

to limit an agency's obligation to obey its own regulations to situations where those regulations match the otherwise applicable constitutional standards.

**16.** We, of course, make no holding as to Riccio's possible right to obtain relief in state court.