# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2842
_____

Thomas Nagel

*Plaintiff - Appellant*

v.

City of Jamestown, North Dakota, et al.

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of North Dakota - Fargo
_____

Submitted: October 16, 2019
Filed: March 9, 2020
_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.
_____

LOKEN, Circuit Judge.

The City of Jamestown, North Dakota (the "City"), fired police officer Thomas Nagel following a lengthy internal investigation into an anonymous tip to local television station KVLY alleging misuse of government property by the Stutsman County Sheriff's Department. The internal investigation concluded that Nagel had violated multiple rules and policies and "eroded public trust in local law enforcement to a severe degree." Nagel filed this 42 U.S.C. § 1983 action against the City and

Chief of Police Scott Edinger (collectively "Defendants") alleging unlawful retaliation for exercising his First Amendment right to participate in a media interview, deprivation of his right to pretermination process, and violation of his rights under the North Dakota Constitution. The district court[1] granted Defendants summary judgment dismissing Nagel's federal claims and declined to reach the merits of his North Dakota Constitution claims, dismissing those without prejudice.[2] Nagel appeals. Reviewing federal law issues *de novo* and dismissal of the supplemental state law claims for abuse of discretion, we affirm.

## I. Background

In late October 2015, station KVLY's "Whistleblower Hotline" received a packet of documents accusing a member of the Sheriff's Department of using a County-owned jet ski for personal use. The packet included a printed screenshot of Deputy Sheriff Matt Thom riding a jet ski with Sheriff Chad Kaiser's son. KVLY identified the screenshot as Thom's Facebook profile picture. The Facebook account that printed Thom's photo was connected by KVLY reporter Christine Stanwood to a Facebook profile named "Dominic."

On November 4, Stanwood took the whistleblower packet to the Stutsman County courthouse to investigate. She learned that morning that Stutsman County did not own a jet ski and that Dominic Brimm was a Facebook alias for Nagel. Stanwood then met with Nagel in the building lobby and showed him portions of the packet. Nagel confirmed he was Dominic Brimm on Facebook, an account he used for police investigating. He identified the screenshot as a picture of Thom on a jet ski but

---

[1]The Honorable William G. Young, United States District Judge for the District of Massachusetts, sitting by designation.

[2]The district court dismissed with prejudice a claim under the North Dakota Administrative Code. Nagel does not appeal this ruling.

denied sending the packet to the Whistleblower Hotline. He consented to be interviewed by Stanwood outside the building to "clear his name" but said: "I can't talk to you as a police officer. I said, I will only talk to you either as Thomas Nagel or as [president of] the North Dakota Fraternal Order of Police." During the interview, Nagel wore civilian clothes and removed his badge.

After the interview, Nagel discussed it with Chief Edinger in his office and then left the courthouse to meet with his attorney, Joseph Larson. In one or both of those meetings, Nagel learned that Stutsman County did not own a jet ski. KVLY aired the story on "Valley News Live" that evening. Entitled "Fraud and Feud at Stutsman County Sheriff's Office," the newsclip began by recounting that KVLY received a tip from "someone named Dominic" alleging the Sheriff's Department was using government property for personal use. After explaining the allegation was false, the newsclip noted a "political dogfight between two of the top cops in Stutsman County." "I am very upset," Sheriff Kaiser said in the newsclip.

Stanwood's narration then explained that the Facebook profile attached to the packet, Dominic Brimm, was an alias for JPD detective Tom Nagel, "who also happens to be the President of the Fraternal Order of Police" (hereafter, "FOP"). The newsclip included images of JPD vehicles and excerpts of Nagel's interview with Stanwood in which he confirmed that Dominic Brimm was his alias but denied sending KVLY the packet: "I was aware of the photograph and what was in it, but I didn't mail it." The transcript of the newsclip continues:

> Then asked: If it wasn't you, then who? [County Auditor Casey] Bradley tells me that the relationship has been strained in the past between Nagel and Kaiser.
>
> "I can say it's somebody that would be in fear of losing their job," says Nagel.

-3-

There was immediate, strong reaction to the KVLY newsclip at the Stutsman County courthouse, which houses both the JPD and the Sheriff's Department. On the following day, Sheriff Kaiser asked Edinger to keep Nagel out of the Sheriff's Department -- which is separated from the JPD by a hallway -- so he could manage the "chaos" in his department. County Auditor Bradley told Edinger that one or more County Commissioners called for Nagel's resignation. The County banned Nagel from its offices and revoked FOP contracts to operate ATMs and vending machines in the County portion of the courthouse. Morale in both law enforcement agencies suffered. JPD officers lamented the loss of trust between the departments; one apologized to a member of the Sheriff's Department on behalf of the JPD. Members of both departments "shunned" Nagel. Edinger reported that some 150 citizens approached him in public to complain that a police officer would "irresponsibly accuse someone of a crime so easily investigated and debunked."

On November 10, Chief Edinger, Sheriff Kaiser, and the County Attorney asked the North Dakota Bureau of Criminal Investigations ("BCI") "to conduct an investigation of the jet ski incident for potential crimes and policy violations." BCI assigned Special Agent Maixner to investigate. His November 12 Report stated that County Auditor Bradley persuaded reporter Stanwood and her supervisor (by speaker phone) that Stutsman County did not own a jet ski by providing a listing of Stutsman County assets and insurance coverages.[3] The Report identified Nagel as the "Subject" of the "Stutsman County Defamation" investigation.

---

[3]Bradley told Maixner that Stanwood showed him a one-page whistleblower letter that accompanied the jet ski screenshot. When Maixner asked if KVLY would disclose the letter, KVLY's attorney replied that it was privileged under federal and North Dakota law. So the precise nature of the misuse-of-government-property accusation was never clarified. It is undisputed that the letter identified Thom's jet ski passenger as Sheriff Kaiser's son, and that the whistleblower packet included a Fish and Game Department registration page which, if accessed carelessly, could be misread as identifying a registered jet ski's owner.

Maixner's Report for November 23 to December 2 stated that Nagel agreed to be interviewed with attorney Larson present. When Maixner arrived on November 23, attorney Larson delivered a three-page letter to the Attorney General of North Dakota declaring that the BCI had no authority to investigate "the identity of the person who submitted an anonymous tip to the KVLY Valley News Live Whistleblower Hotline" and a lengthy Memorandum, titled "Regarding BCI Investigation of Anonymous Tip," that argued why Nagel could not be convicted of violating the relevant North Dakota statute. Though Larson's jurisdictional argument was rejected and the BCI investigation continued, Nagel was never interviewed. In early February 2016, based on Maixner's final report, the county attorney assigned to decide the issue concluded there was insufficient evidence to support a prosecution for criminal defamation.

At the same time they requested BCI's criminal investigation, the JPD and the Sheriff's Department began a joint internal investigation of the false accusation of misuse of government property. Two experienced officers, Major John Johnson of the JPD and Major Jason Falk of the Sheriff's Department, interviewed over 30 people from the two departments. Nagel was the last to be interviewed on February 19, 2016. In the interview, Nagel denied mailing the packet to KVLY and said he did not know who sent it. Nagel denied telling JPD Police Officer Jason Prochnow after the KVLY interview that he knew who sent it but would not disclose the whistleblower's identity.[4] He denied telling Edinger after the KVLY interview he knew who sent it. Nagel said he participated in the KVLY interview to "clear [his] name." He said his statement that "someone in fear of losing their job" sent the packet did not refer to anyone in particular.

---

[4]In his deposition, Prochnow testified that, in a short conversation in a hallway, Nagel whispered, "I know who did this, but I'm not saying."

In late February, Johnson and Falk submitted reports summarizing their findings and conclusions from the internal investigation. Major Johnson concluded that Nagel's statements in the KVLY interview would not "lea[d] the public to believe that he was clearing his name," and his appearance "brought discredit to himself but also [the JPD and the Sheriff's Department]." Major Falk noted that four individuals interviewed recalled Nagel telling them he knew who sent the packet. Falk concluded, "It is extremely difficult not to believe that Detective Nagel is protecting the identity of whoever is responsible for the false allegation." After reviewing these reports, Edinger convened a Review Board of four officers and one citizen to determine if JPD officers had violated JPD policies "surrounding or related to the Whistle Blower broadcast of November 4th, 2015." After reviewing the reports from the criminal and internal investigations and the JPD Rules and Regulations and Code of Ethics, the Review Board unanimously recommended Nagel be terminated.

In a March 7, 2016 letter to City Administrator Jeffrey Fuchs, Edinger agreed with the Review Board and recommended Nagel's termination. "The review board determined Sgt. Nagel violated 19 policies," Edinger noted. He opined that Nagel violated the Peace Officer's Code of Conduct by being aware of alleged felony misuse of government property and not reporting it. He noted several witnesses heard Nagel talk about knowledge of the incident, contradicting his internal interview, which "likely makes him a 'Giglio impaired law enforcement officer.'"[5] In addition, Edinger opined, "Sgt. Nagel eroded public trust in local law enforcement to a severe degree," making him "no longer a viable law enforcement officer."

In a letter to Nagel dated March 9, 2016, Fuchs and Jamestown Mayor Katie Anderson concurred in the recommendations of the Review Board and Edinger and

_____

[5]In Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court held that the prosecution must disclose in a criminal case evidence that would impeach its witnesses, such as a testifying police officer's prior untruthfulness.

terminated Nagel's employment for violations of the Law Enforcement Code of Ethics and JPD Rules and Regulations. Nagel promptly appealed to the Jamestown Civil Service Commission, which conducted an eight hour post-termination hearing on April 27. Nagel, represented by counsel, submitted 121 exhibits, called seven witnesses including five experts, made an opening statement, examined and cross-examined witnesses, and submitted a one-hundred-page closing brief. On May 20, the Commission affirmed Nagel's dismissal. This lawsuit followed.

## II. The First Amendment Retaliation Claim

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). Garcetti noted two inquiries in determining whether public employee speech is protected against employer retaliation:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

547 U.S. at 418 (citations omitted). "The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane v. Franks, 134 S. Ct. 2369, 2379 (2014). "Under Garcetti, when a public employee speaks on a matter of public concern pursuant to his official duties, the speech is *unprotected* against employer retaliation." Lyons v. Vaught, 875 F.3d 1168, 1173 (8th Cir. 2017). Underlying factual disputes concerning whether the plaintiff's speech is protected "should be submitted to the jury through special interrogatories or special verdict forms," for

ultimate review of the legal issue by the court. <u>Shands v. City of Kennett</u>, 993 F.2d 1337, 1342 (8th Cir. 1993).

The district court concluded that Nagel was not speaking as a citizen in the KVLY interview. He agreed to be interviewed as a representative of the FOP, he was identified as a Jamestown police officer, his gun and handcuffs were visible, and the story's subject was feud and fraud at the Stutsman County Courthouse. We agree. Nagel argues he spoke as a citizen because he removed his badge, left the courthouse, instructed Stanwood not to identify him as a JPD officer, and took FOP "comp" time for the interview. However, Nagel told the interviewer he knew about the photo sent to the Whistleblower Hotline, did not know who sent it, but "can say it's somebody that would be in fear of losing their job."

These references to internal law enforcement affairs made clear to the viewing public that Nagel's appearance at the interview was ordinarily within the scope of his duties as a member of the JPD and President of the FOP. "[W]hen a government employee answers a reporter's questions involving matters relating to his employment, there will be circumstances in which the employee's answers will take on the character of '[o]fficial communications,' and thus will not be entitled to First Amendment protections." <u>Foley v. Town of Randolph</u>, 598 F.3d 1, 8 (1st Cir. 2010) (quoting <u>Garcetti</u>, 547 U.S. at 422). As in <u>Foley</u> and in <u>Nixon v. City of Houston</u>, 511 F.3d 494, 498-99 (5th Cir. 2007), this was such a circumstance. Though Nagel was not required to speak to the media at the scene of its investigation, he chose to do so. Predictably, the reporter portrayed him as a representative of the JPD and the FOP.

The district court further concluded that Nagel's speech during the interview was not on a matter of public concern because his asserted desire "to clear the name of Dominic Brimm, his Facebook alias," was a purely private interest. Nagel argues that government malfeasance is a matter of public concern even if the allegation proves to be false. That is no doubt true. But in determining whether employee

speech addressed a matter of public concern, we examine the content, form, and context of the speech. Connick v. Myers, 461 U.S. 138, 147-48 (1983). If the employee's main motivation is to further a private interest, his "speech is not protected, even if the public would have an interest in the topic of [his] speech." Anzaldua v. Ne. Ambulance and Fire Prot. Dist., 793 F.3d 822, 833 (8th Cir. 2015) (quotation omitted). Here, Nagel's reported speech at the KVLY interview was an attempt to distance himself from the matter of public concern being investigated -- despite the photo's link to Dominic Brimm, Nagel denied sending the whistleblower packet or knowing who sent it.

The district court further concluded that, even assuming Nagel was a citizen commenting on a matter of public concern, his speech at the interview was not First Amendment protected under the second Garcetti inquiry -- "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." 547 U.S. at 418. This inquiry requires a court to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). Applying non-exclusive factors this court has weighed for many years,[6] the district court concluded "it is clear that the City's interest outweighs that of Nagel" -- the KVLY interview "created great disharmony in the workplace, interfered with Nagel's ability to perform his duties, and impaired his working relationships with other employees." Again, we agree.

Regarding the employer's interest in preventing disruption and disharmony in the workplace, the JPD, as a public safety organization, "has a more significant interest than the typical government employer in regulating the speech activities of

---

[6]See, e.g., Anzaldua, 793 F.3d at 835; Tyler v. City of Mountain Home, Ark., 72 F.3d 568, 570 (8th Cir. 1995); Shands, 993 F.3d at 1344.

its employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." Shands, 993 F.2d at 1344 (quotation omitted); see Morgan v. Robinson, 920 F.3d 521, 526 (8th Cir. 2019) (en banc). We give "considerable judicial deference" to government determinations that a public safety employee's speech "had caused or would cause dissension and disruption." Anzaldua, 793 F.3d at 834 (quotation omitted).

Nagel argues there is insufficient evidence of disruption, as evidenced by the fact that the City did not fire him until four months after the story aired. We disagree. The summary judgment record contains overwhelming evidence of *actual* disruption. Indeed, the undisputed evidence of actual disruption and demonstrated impact far exceeds that in Anzaldua and in Morgan, a case in which we affirmed the grant of summary judgment because the claimed First Amendment violation was not "clearly established." Following airing of the newsclip, the Sheriff's Department barred Nagel from their offices and cancelled the FOP's ATM and vending machine contracts. Some officers shunned Nagel for talking to the news media about an internal issue. Others were distressed by the rift it created with the Sheriff's Department, and with good reason. The public complaints to Edinger reflected, not surprisingly, that the citizens of Stutsman County have a strong interest in good working relations between two agencies operating out of the same courthouse and sharing responsibilities for effective law enforcement.

The false whistleblower allegation implied that Sheriff Kaiser had violated the law by misusing government property, a theme fostered by Nagel's participation in the KVLY interview. This triggered a BCI investigation into whether members of either agency had committed criminal defamation and a lengthy internal investigation. After over thirty internal investigation interviews, the investigators found that Nagel lied in the KVLY interview and again in his internal interview by denying he knew who sent the whistleblower packet, a finding which the Review Board and Chief Edinger adopted. The finding that Nagel had been dishonest, even if wrong, made

-10-

him a <u>Giglio</u>-impaired officer because prosecutors would now be required to disclose the finding any time he testified. The "shunning" by other officers further compromised Nagel's ability to perform his job effectively by adversely affecting the close working relations essential in a police department. An amicable working relationship between the two law enforcement agencies was an important employer interest. <u>See</u> <u>Tyler</u>, 72 F.3d at 570.

For these reasons, we conclude the district court properly granted Defendants summary judgment dismissing Nagel's First Amendment retaliation claim because he failed to prove his speech as a public employee was protected by the First Amendment under <u>Connick</u>, <u>Pickering</u>, <u>Garcetti</u>, and <u>Lane</u>.

### III. The Procedural Due Process Claim

Defendants concede that Nagel possessed a property interest under North Dakota law in continued employment with the JPD. Therefore, the Due Process Clause of the Fourteenth Amendment required that he not be deprived of that interest "except pursuant to constitutionally adequate procedures." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 541 (1985). In <u>Loudermill</u>, the Court reaffirmed that the Due Process Clause requires "some form of pretermination hearing" prior to an employee's discharge. <u>Id.</u> at 542. On appeal, Nagel argues the district court erred in concluding that the City afforded him constitutionally adequate pre-termination process. We review the grant of summary judgment on this claim *de novo*. <u>Krentz v. Robertson</u>, 228 F.3d 897, 902 (8th Cir. 2000).

The pretermination hearing serves "as an initial check against mistaken decisions -- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." <u>Loudermill</u>, 470 U.S. at 545-46. Prior to termination, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an

explanation of the employer's evidence, and an opportunity to present his side of the story." Id. at 546. The pretermination hearing "need not be elaborate," and "the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures." Id. at 545, 547 n.12. Here, Nagel was afforded a full trial-like Civil Service Commission hearing in which he was represented by counsel.[7]

Nagel's primary argument on appeal is that the City clearly violated the Due Process Clause requirements of Loudermill because the only arguable pretermination hearing was an internal investigation interview in which Major Johnson refused to explain the charges he was investigating and gave Nagel no opportunity "to present his side." We reject this contention, first because it drastically understates the panoply of pretermination procedures that served "as an initial check against mistaken decisions" in this unusual case.

The process began with the BCI's criminal investigation of who had falsely accused Thom and Sheriff Kaiser of unlawfully misusing government property. When Special Agent Maixner arrived to interview Nagel on November 23, attorney Larson presented a letter demanding that the Attorney General end the investigation and a lengthy legal memorandum explaining that Nagel had committed no offense and denying any "relationship or connection between an anonymous tip to the Whistleblower Hotline and Thomas Nagel's employment with the Jamestown Police

---

[7]Nagel argues the district court erred by citing our statement in Smutka v. City of Hutchinson that "robust post-termination proceedings may *cure* superficial pretermination proceedings," 451 F.3d 522, 527 (8th Cir. 2006) (emphasis added), in a case in which the employer provided *no* pretermination process. The point is irrelevant, as pretermination process was provided in both Smutka and in this case. Our use of the word "cure" should not give rise to this issue. It was a shorthand for our more precise interpretation of Loudermill in other cases: "as long as there are adequate post-termination [proceedings] available, the pretermination [proceedings] need not be extensive." Krentz, 228 F.3d at 903 (quotation omitted); see Sutton v. Bailey, 702 F.3d 444, 447-49 (8th Cir. 2012).

Department." In late December, Larson wrote Special Agent Maixner advising that "word on the street" was that Stutsman County has used a similar jet ski "for law enforcement operations," and that entering Stutsman County and the registration number of the jet ski Thom was riding on the "Game and Fish Watercraft Renewal Web Site" would produce a "registration is current" response.

On January 14, 2016, Larson filed a grievance with the Stutsman County Commissioners alleging that County Auditor Bradley "for no good reason maligned and vilified Nagel and the FOP in his remarks during the KVLY newsclip." On January 25 and 27, Nagel filed two grievances with the City Personnel Director against Chief Edinger for actions taken after the KVLY newsclip aired; each grievance included a lengthy defense of Nagel's actions on November 4.

On February 11, Major Johnson advised Nagel that "I needed to interview him as part of the internal investigation." Nagel responded that dealings should be through attorney Larson. On February 15, Johnson received a letter from Larson threatening criminal charges and a § 1983 lawsuit against Edinger and Johnson. Johnson's response confirmed the purpose of the investigation was "violations of the Rules and Regulations of the Jamestown Police Department" and ordered Nagel to appear for an interview during normal working hours on February 19. To protect Nagel's right to criminal immunity under Garrity v. New Jersey, 385 U.S. 493 (1967), Larson obtained a writ of mandamus excluding employees of any other investigative agency from attending the interview, including Major Falk. Johnson then conducted the interview on February 19 with Larson present.

At the interview's outset, Johnson stated that he "had been assigned by Chief Edinger to conduct an internal investigation into the incident November 4 that occurred on . . . Valley News Live." After Nagel confirmed his familiarity with the incident, Johnson read Nagel his "Garrity rights":

-13-

You are hereby ordered to fully cooperate with the investigating officer. Your failure to cooperate will create an objective and subjective fear of termination. You have the following rights and responsibilities during this investigation: You have the right to be informed of the allegations involved. You'll be asked questions directed and narrowly related to the performance of your official duties. Statements made during any interviews may be used as evidence of misconduct or as the basis for seeking disciplinary action against you. Any statements made by you during these interviews cannot be used against you in any subsequent criminal proceeding.

Nagel asked what allegations were involved. Johnson replied, "violation[s] of Jamestown Police Department's Rules and Regulations" and the "Code of Ethics." When pressed by Nagel on the "work related nature" of the investigation, Johnson said "you were a representative of the Jamestown Police Department on November 4, 2015 when you appeared in front of the camera . . . and you may have discredited our police department by doing that." This confirmed that Nagel faced disciplinary action depending on what the investigation discovered. See Powell v. Mikulecky, 891 F.2d 1454, 1459 (10th Cir. 1989). Johnson then questioned Nagel about his involvement in the KVLY story and what he knew about the whistleblower's identity. The questions made clear that other persons interviewed had said Nagel admitted knowing but refused to disclose who sent the whistleblower packet to KVLY, giving Nagel an opportunity to respond on an issue that could obviously result in discipline. Before concluding the interview, Johnson asked Nagel if there was "something else" he would like to add. Nagel declined.

Loudermill requires public employers to include in the pretermination process a "meaningful opportunity to invoke the discretion of the decisionmaker . . . before the termination takes effect." 470 U.S. at 543. Throughout the lengthy process following the KVLY newsclip, Nagel repeatedly confirmed that, as a participant, he "knew enough about the incident to prepare a response," Smutka, 451 F.3d at 527, and he had many meaningful opportunities to present his side of the case. A

-14-

meaningful opportunity to respond may occur prior to the completion of an investigation into possible wrongdoing. See Post v. Harper, 980 F.2d 491, 494-95 (8th Cir. 1992). It is well established that Major Johnson was not obligated "to provide all the details of the charges." Larson v. City of Fergus Falls, 229 F.3d 692, 697 (8th Cir. 2000); see Sutton, 702 F.3d at 448. Nagel acknowledged receiving and consulting the JPD Rules and Regulations manual as a JPD officer. See Keefe v. Adams, 840 F.3d 523, 535-36 (8th Cir. 2016). He appreciated the gravity of the interview and zealously presented his side of the events surrounding the KVLY story, as he had done in the January grievances.

Nagel's internal investigation interview departs from most of our Loudermill cases in one notable way. Unlike the plaintiffs in Post and Keefe, Nagel did not meet with a supervisor in his pretermination hearing. However, this does not render the pretermination process deficient. An investigative meeting can provide an employee constitutionally sufficient pretermination process even when the meeting is not conducted by the employee's supervisor. See Danielson v. City of Seattle, 742 P.2d 717, 722-23 (Wash. 1987) (internal police department interview during which plaintiff officer admitted the charge was sufficient pretermination process); Riccio v. Cty. of Fairfax, 907 F.2d 1459, 1465 (4th Cir. 1990) (police officer's meetings with officer investigating allegations of wrongdoing provided effective notice of the charges). Extra layers of review did not rob Nagel of an opportunity to respond. They helped ensure the accuracy of the City's decision to terminate.

Nagel was fired in part for lying in his interview and not disclosing the person who sent a false misuse-of-property allegation to the media. But lying in the initial opportunity to respond does not entitle the employee to a separate opportunity to respond to the charge of dishonesty. See Keefe, 840 F.3d at 535-36 (when plaintiff's response at an informal pretermination meeting "provided the predicate" for his removal, no additional opportunity to respond was necessary). Major Johnson's questions made it clear that other persons said that Nagel knew the whistleblower's

-15-

identity. Nagel knew the chaos and disruption the false accusation had caused in both law enforcement agencies, knew it was his duty as a police officer to disclose the wrongdoer, and knew that failing to do so would almost certainty lead to discipline if not dismissal. In these circumstances, a requirement that the employer provide an additional opportunity to respond before adverse action is taken would be an unwarranted intrusion on the "governmental interest in the expeditious removal of unsatisfactory employees." Loudermill, 470 U.S. at 543.

Though Nagel declined to be interviewed by the BCI and declined Major Johnson's invitation to say more at the end of that interview, he took full advantage of many opportunities to explain why he had done nothing wrong in the grievances he filed against Edinger and Bradley and in Larson's attack on the BCI's jurisdiction and grievance against Auditor Bradley. Unfortunately for Nagel, facts pointed the other way, especially fellow officers contradicting his insistence he did not know who sent a screenshot photo identified by his Facebook name "Dominic" to the media. Based on ample pretermination evidence guarding against a "mistaken decision," Major Johnson, Major Falk, the Review Board, and Chief Edinger concluded that Nagel had not been truthful and had brought discredit on the JPD. The City's decisionmakers agreed and fired Nagel. Their decision was upheld after a full trial-type post-termination hearing. The district court did not err in concluding there was no deprivation of Nagel's federal right to procedural due process.

## IV. The North Dakota Constitution Claims

Finally, Nagel argues the district court erred in dismissing without prejudice his claim that Defendants' actions violated his free speech and due process rights under Article I, Sections 4, 5, and 9 of the North Dakota Constitution. When the district court has disposed of all federal claims that conferred original jurisdiction, it may decline to exercise supplemental jurisdiction over remaining state law claims. 28 U.S.C. § 1367(c)(3). Usually, the dismissal of the federal claims "will point

toward declining to exercise jurisdiction over the remaining state-law claims." Wilson v. Miller, 821 F.3d 963, 971 (8th Cir. 2016) (quotation omitted).  Such a dismissal is without prejudice and is reviewed for abuse of discretion.  See Johnson v. City of Pine Bluff, 450 F. App'x 557, 557 (8th Cir. 2012).

There is no North Dakota statute that creates a private right of action for violations of the North Dakota Constitution, like 42 U.S.C. § 1983.  In Kristensen v. Strinden, 343 N.W.2d 67, 70 (N.D. 1983), the Supreme Court of North Dakota stated that "our court to date has not implied a direct cause of action for damages for violations of the North Dakota constitutional provisions relied upon," though North Dakota courts have power to do so.  The district court, declining to take the "extraordinary step" of inferring a right of action under the North Dakota Constitution when the Supreme Court of North Dakota has not done so, dismissed these claims without prejudice so Nagel may pursue them in state court.  There was no abuse of discretion.

For the foregoing reasons, the judgment of the district court is affirmed.

_____