**William Henry GREEN, Plaintiff,**

v.

**CLARENDON COUNTY SCHOOL DISTRICT THREE; Carnell Hampton, in both his individual capacity and as member of the Clarendon County School District Three Board of Trustees; and Edgar C. Taylor, in both his individual and official capacity as Superintendent of Clarendon County School District Three, Defendants.**

Civ. A. No. 2:94–4–18AJ.

United States District Court,
D. South Carolina,
Charleston Division.

April 30, 1996.

## ORDER

NORTON, District Judge.

*Words are like leaves; and where they most abound, much fruit of sense beneath is rarely found.*

—ALEXANDER POPE, AN ESSAY ON CRITICISM.

This action is before the court on the parties' verbose and extensive cross-motions for summary judgment.[1] For the reasons set forth below, the court denies Plaintiff's motion for summary judgment, and the court grants in part and denies in part Defendants' motion for summary judgment.

## I. BACKGROUND

This case arises out of an allegation of racial discrimination in employment. Plaintiff was first employed by the Defendant Clarendon County School District Three ("District") as an elementary school teacher in 1975. From 1977 to 1978, Plaintiff taught middle school in Clarendon County School District Two, and then returned to the District in 1978 to teach at Walker–Gamble Elementary School ("Walker–Gamble"). During the 1979–1980 school year, Plaintiff served as a teacher and assistant principal of Walker–Gamble, and then in 1980 Plaintiff was promoted to principal of East Clarendon Middle School ("East Clarendon"). In June of 1986, Plaintiff was terminated from that position and reassigned to a district administrative level position as transportation supervisor and director of maintenance and purchasing. In 1987, Plaintiff accepted a position teaching at Walker–Gamble, where he taught until April 14, 1994, when his employment was terminated. During the time frame relevant

William E. Craver, III, Jay T. Gouldon, Richard Stoney, Charleston, SC, for plaintiff.

Todd W. Smyth, G. Mark Phillips, Charleston, SC, Kenneth L. Childs, Columbia, SC, for defendants.

1. Local Rule 12.05 provides that no memorandum shall exceed 35 double-spaced pages in the case of an initial brief of any party. On January 8, 1996, both parties submitted motions for summary judgment. That same day, Defendants filed a motion for granting an exception to the 35–page limit. Plaintiff's brief was 39 pages, and Defendants' brief was 46 pages. On January 23, 1996, Plaintiff filed his memorandum in opposition to Defendants' motion. Taking the cue from his adversary, Plaintiff filed on the same day a motion for granting an exception to the 35–page limit. Apparently believing this motion allowed his brief to be endless, Plaintiff's opposition brief was a full 99 pages in length. Defendants' opposition brief was 28 pages. In addition, each party filed a discovery appendix of over 100 pages each.

Despite the fact that Local Rule 12.07 strongly discourages the filing of reply briefs, both parties did so. Each party's reply brief was an additional 11 pages, bringing the total page number of the parties' briefs alone to over 230 pages. This court looks with strong disfavor on the parties' repetitive, excessive filings and their blatant disregard for the local rules.

to this lawsuit, therefore, Plaintiff was an elementary school teacher for the District.

In 1992, two principal positions became available in the District, one at Walker–Gamble and one at East Clarendon. Plaintiff applied for the position of principal at East Clarendon. Both vacancies were advertised in local newspapers and, in addition, the Superintendent (Defendant Dr. Taylor) asked the principals of schools within the District to announce the vacancies to members of their faculty. The Superintendent formed selection committees at both schools, each committee comprised of approximately six members of the faculty of the respective schools. Each committee developed a profile of a desirable candidate for principal, comprised a list, and submitted it to the Superintendent.

At Walker–Gamble, the Superintendent himself screened applications, selected candidates for interviews, and conducted those interviews. The Superintendent then selected the best candidate and two alternates based on his interviews. At East Clarendon, the selection committee rather than the Superintendent screened applications and selected those individuals to be interviewed. This list was submitted to the Superintendent, who added one applicant to the list. The resulting list of applicants was interviewed separately by both the selection committee and the Superintendent. The selection committee then forwarded to the Superintendent the names of three individuals, ranked in no particular order. The Superintendent also arrived at the same three names, and selected the one person he would recommend to fill the position, together with two alternates.

Defendants allege that while the Superintendent and the selection committees were carrying out the selection process, Plaintiff was attempting to persuade individual members of the school board to elect him to fill the principal position at East Clarendon. (Mem.Supp.Defs.' Mot.Summ. J., at 4), citing Dep. of Pl. (II) at 76–80, 180–181. Defendants point out that Plaintiff has close personal ties to two members of the board, F.C. Green (Plaintiff's cousin), and Larry Coker

(also a cousin of the Plaintiff, and his next-door neighbor). (Dep. of Pl. at 77–78, 99–100.)

The school board met on March 25, 1993, in executive session,[2] to consider the applications for principal at both schools. The board is comprised of six white members and one black member. It is undisputed that the Superintendent recommended that the board elect Ms. Connie Dennis, a white applicant, for the position at Walker–Gamble. The board unanimously accepted the recommendation of Ms. Dennis. Defendants urge that this was consistent with "the Board's long-standing tradition of deferring to the decision of the superintendent regarding the hiring of new administrators." Id., citing Dep. of Blakely, at 147–48; Dep. of F.C. Green, at 78; Dep. of Hampton, at 80.

The school board's actions following the discussion of Ms. Dennis' application are the subject of dispute. The Plaintiff, who is white, characterizes the selection of East Clarendon's principal as follows:

It is undisputed that Board members F.C. Green, Benton Blakely and Col. Larry Coker made their decision to vote to select [Plaintiff] to fill the East Clarendon Middle School position of principal during the meeting. L. Coker Deposition at 55. Blakely Deposition 83–84. F.C. Green Deposition at 33. Hampton Deposition, 49, 58–59. There is testimony that Board members Allen Coker, Ben Floyd and Alton Newton, Jr. indicated they would not vote to select [Plaintiff] to fill the East Clarendon Middle School position of Principal. L. Coker Deposition at 55. Hampton Deposition, 49, 58–59. Mr. Floyd acknowledged that Mr. F.C. Green and Mr. Blakely said they would vote for [Plaintiff], said he could not recall whether Colonel Coker expressed an opinion, and indicated he would vote for Mrs. Boston. Floyd Deposition, 31–32. Mr. Allen Coker stated that "Mr. Benton (Blakely) and Mr. (F.C.) Green and Colonel Larry (Coker) were sort of in favor of Mr. Green, Mr. Henry Green." Coker Deposition at 45. He fur-

**2.** After discussing the candidates in executive session, the board formally votes on the positions in its regular session. (Mem.Supp.Pl.'s Mot. Summ. J. at 6).

ther stated the other Board members were in favor or [sic] Mrs. Boston. *Id.* Mr. Newton acknowledges that Mr. F.C. Green and Mr. Blakely supported [Plaintiff] for the position and further indicated that he did not recall anybody else's opinion. Newton Deposition at 46. Reverend Hampton stated that he would not vote for [Plaintiff] because of [Plaintiff's] race ...

In addition to [Plaintiff], the Board also considered a black, Mrs. Linda Boston ...

(Mem.Supp.Pl.'s Mot.Summ. J. at 7–8).

Defendants, on the other hand, allege that the Superintendent specifically recommended Ms. Boston, and *then* certain members of the board suggested that the board elect Plaintiff instead:

The Superintendent recalls that he recommended Linda Boston for the position at East Clarendon, along with the names of two alternates, in the same manner he had submitted Ms. Dennis' recommendation. (Blakely 147–148; F.C. Green 78; Hampton 80). A majority of the members of the Board—Benton Blakely, Allen Coker, Ben Floyd, Rev. Hampton and Al Newton—stated at their depositions that Dr. Taylor specifically recommended Ms. Boston for the position. (Blakely 85, 145; A. Coker 43–44; Floyd 30; Hampton 48; Newton 38–42). Mr. (F.C.) Green maintains that he noticed Plaintiff's name in the folders the Superintendent had passed out and recommended that the Board hire Plaintiff as the middle school principal, before the Superintendent issued a recommendation. Mr. (F.C.) Green, however, acknowledges that at some point in the proceedings Ms. Boston was also considered for the position. (F.C. Green 35.) The remaining Board member, Larry Coker, seems to recall that Dr. Taylor asked the Board to decide between Plaintiff and Ms. Boston, although he acknowledged that it is possible that the Superintendent specifically recommended Ms. Boston. (L. Coker 53, 84). In any event, the minutes of the March 25 meeting expressly state that with regard to Walker–Gamble Elementary School "[t]here was a recommendation from the Superintendent to hire Ms. Connie Dennis as principal" of Walker–Gamble

Elementary and that there was also "a recommendation from the Superintendent to hire Ms. Linda Boston as principal for the East Clarendon Middle School." (Minutes of March 25, 1993 Bd.Mtg.)

(Mem.Supp.Defs.' Mot.Summ.J. at 4–5).

One board member remembers that at some other point in the discussion, the Superintendent commented that he had recently observed Plaintiff in a parent-teacher conference, and that it was "the worst he had ever seen." (Mem.Supp.Defs.' Mot.Summ. J. at 6, *citing* Dep. of Blakely, at 72). Another board member commented at the meeting that persons in his community had told him they did not want Plaintiff to be appointed principal. (Mem.Supp.Defs.' Mot.Summ.J. at 6, *citing* Dep. of A. Coker, at 51).

It is undisputed that at some point Defendant Hampton, the board's only black member, stated that he would not vote for two white principals. As Defendant Hampton stated in his deposition,

I made a statement that I would not vote for—I was not going to vote for two white principals. And the statement came out of the discussion when we were—when Mr. Green was being recommended, we had board members suggesting we give him the job and after it—the conversation went on for a while and I told them, I said I'm not going to vote for two white principals because we have 40 percent of the kids in the school are black and I think we need to have a black principal and if you want to recommend Mr. Green for the position, we can hire Mr. Green at the elementary school or at the middle school, I don't care. If we want Mr. Green, we can put him at the elementary school or at the middle school, but I'm just not going to vote for two white principals.

(Dep. of Hampton, at 50). In his deposition, Defendant Hampton testified that he voted for Ms. Boston because she was recommended by the Superintendent, (Dep. of Hampton, at 51), and that if the Superintendent had recommended Plaintiff, he would have voted for him instead. (Dep. of Hampton, at 54).

At the executive session, board members Allen Coker, Ben Floyd, Alton Newton, Jr., and Defendant Hampton indicated they would vote for Ms. Boston. (Dep. of L. Coker at 55; Dep. of Blakely at 83–84; Dep. of F.C. Green at 33; Dep. of Hampton at 49, 58–59); (Dep. of A. Coker at 45; Dep. of Newton at 43; Dep. of Floyd at 35). Board member Larry Coker suggested that Ms. Boston be elected unanimously, which was consistent with his past practice of voting publicly for the candidate selected by the board in executive session. (Dep. of L. Coker, at 59–60).[3] When the board met in regular session, Ms. Dennis was elected principal of Walker–Gamble unanimously, and Ms. Boston was elected principal of East Clarendon by a vote of 5–2 (with F.C. Green and Benton Blakely voting against Ms. Boston's election.)

On May 26, 1993, Plaintiff filed a charge of discrimination with the South Carolina Human Affairs Commission ("SCHAC") and the United States Equal Employment Opportunity Commission ("EEOC"), charging racial bias in the process of selecting the principal of East Clarendon on March 25, 1993, and discrimination on the basis of his race. On September 27, 1993, SCHAC issued a Notice of Right to Sue stating that Plaintiff's charge was dismissed because "no reasonable cause was found to believe that the allegations made in [Plaintiff's] charge constituted an unlawful discriminatory act under Human Affairs Law." (Defs.' Exs. 17–19).

On January 4, 1994, Plaintiff filed this action in district court against the District and against Defendant Hampton, individually and as a member of the board, alleging these causes of action: (1) Defendants' failure to promote Plaintiff to the position of principal of East Clarendon Middle School constituted disparate treatment on the basis of his race in violation of Title VII; and (2) Defendants' failure to promote Plaintiff constituted intentional discrimination on the basis of his race in violation of the Fourteenth Amendment and 42 U.S.C. § 1981 and § 1983.

Plaintiff was terminated from employment as a teacher at Walker–Gamble on April 14, 1994. Again, the events leading up to Plaintiff's termination are the subject of dispute, with Plaintiff characterizing the termination as retaliation for his filing a charge of discrimination, and Defendants characterizing the termination as justified by Plaintiff's actions.

First, the Superintendent became aware of possible sexual harassment by Plaintiff through reports related to him by members of the District office staff. (Dep. of Taylor (II), at 82–83.) The Superintendent stated in his deposition that he did not act on these reports at first, but that after attending a seminar on sexual harassment in the workplace and obtaining further legal advice, he decided that he had an obligation to investigate the allegations relating to Plaintiff. (Dep. of Taylor (II), at 82–85). The Superintendent wrote Plaintiff a letter on August 9, 1993, advising Plaintiff of the purpose of the investigation and instructing him to refrain from discussing the matter with any of his colleagues. (Pl.'s Ex. 9). However, Plaintiff apparently contacted some of the employees who had been interviewed by the Superintendent, questioned them about the Superintendent's inquiry, and attempted to persuade them not to pursue the matter further. (Dep. of Leviner, at 28, Ex. 34; Dep. of Mims, at 8–11, Ex. 35). After he had conducted interviews of the female employees who had made accusations against Plaintiff, the Superintendent met with Plaintiff to advise him of the charges against him and give him an opportunity to respond. Plaintiff was represented by his own attorney at this meeting. (Dep. of Pl., at 103).

On September 9, 1993, Dr. Taylor advised Plaintiff by letter of the results of his investigation, concluding that Plaintiff had engaged in "conduct that is unprofessional and indicative of a lack of good judgment," and advising Plaintiff to refrain from similar behavior in the future. (Pl.'s Ex. 12). The next day Plaintiff indicated that he intended to pursue the matter and requested a hearing before

---

**3.** Plaintiff asserts that Defendant Hampton's vote was pivotal because Mr. L. Coker was in favor of Plaintiff until he saw that a majority of the board was in favor of Ms. Boston, at which point Mr. L. Coker decided to vote with the majority.

the board. (Pl.'s Ex. 13). Dr. Taylor responded with a letter requesting that Plaintiff follow the District's written grievance policy. (Pl.'s Ex. 13).

Plaintiff was granted a hearing before the Superintendent on October 25, 1993, where Plaintiff and his attorney were given the opportunity to present testimony or other evidence. (Pl.'s Ex. 26). On October 29, 1993, Dr. Taylor informed Plaintiff that his grievance was denied, and advised him of his right to appeal to the board. (Pl.'s Ex. 26). Two days later, Plaintiff notified Dr. Taylor of his desire to pursue such an appeal. (Pl.'s Ex. 27).

Plaintiff was granted a hearing on November 22, 1993, after which the board advised Plaintiff that it had found that Plaintiff had "not engaged in sexual harassment," but that it had found that "on one or more occasions, [Plaintiff had made] unprofessional and inappropriate remarks of a sexual nature to female employees." (Pl.'s Ex. 15). The board also advised Plaintiff that their letter, and the Superintendent's September 9, 1993 letter, would be entered into his personnel file, but that they would be removed at the end of the school year if Plaintiff was involved in no further such incidents. (Pl.'s Ex. 15).

The remaining facts which form the basis of Plaintiff's claim of retaliation by the Defendants concern Plaintiff's relationship with his supervisor, Ms. Dennis, the newly elected principal of Walker–Gamble. On April 27, 1993, Ms. Dennis began keeping a notebook of incidents involving Plaintiff, which had reached twenty-two pages by the time of her last entry on March 18, 1994. (Dep. of Dennis, Ex. 3). The diary reflects numerous times in which Ms. Dennis noticed that Plaintiff was absent from work, left his classroom unattended, and made excessive personal use of the telephone. In a letter dated January 10, 1994, Ms. Dennis pointed out to Plaintiff a number of these concerns. (Dep. of Pl., Ex. 29).

In response to Ms. Dennis' letter, Plaintiff filed a grievance against her on the ground that "[s]ince you apparently feel that the issues were severe enough [to place] in my personnel file, I feel that I should address each of the issues whether stated or implied."

(Dep. of Pl., Ex. 30). Ms. Dennis heard Plaintiff's grievance on January 27, 1994, and by letter of February 1, 1994, advised Plaintiff of her decision to deny his grievance and leave her January 10, 1994 letter in his personnel file. (Dep. of Pl., Ex. 30). Two days later, Plaintiff filed a charge of retaliation. (EEOC Notice of Charge of Discrimination, February 3, 1994).

On March 9, 1994, Plaintiff had a conference with Ms. Dennis regarding his performance evaluation. Ms. Dennis made the following record of that conference in her "diary":

At 2:05, I talked with Mr. Green about his evaluation. He was upset about two parts under professional qualities and two parts under personal qualities. I did record his comments under Teacher's Comments. He refused to sign the evaluation form. Mr. Green had the following things to say. "I had surprised him. I was a cold person." I told him that I had been trained by the same person(s) who trained him. I also said I wanted to run a good school. He said, "I needed to run (work with) a good staff." That was where I (HG) made my mistake. (apple core/high horse) I (HG) followed the book. He told me I (CD) was playing Russian Roulette and had pulled the wrong trigger.

Mr. Green then started talking about the mistake I had made with the computer lab and Mrs. Parrish's absences. He made a mistake and got fired. The same thing was going to happen to me. He had the best school lawyer in the state. He was going to take me for the ride of my life.

We were trying to fire him. I (CD) was being manipulated by Dr. Taylor. He was not in as good of health now as he was. I (CD) was not helping things either. My so-called friends were not my real friends. I (CD) was making enemies at the school. I (CD) said, "I don't think I have any friends according to you (HG)." Mr. Green said, "You don't! If you burn my house down, I'll burn yours. You just remember that."

Mr. Green then started talking about how he had given me every chance not to get

involved. He reminded me that he had gone to great lengths to leave me out of his lawsuit. When he left my office at 2:25, Mr. Green reminded me to think about what he had said.

(Pl.'s Mem.Opp.Defs.' Mot.Summ.J., Dep. App. II, at 17–19).

Ms. Dennis referred this matter to the Superintendent, who placed Plaintiff on administrative leave with pay on March 18, 1994. (Pl.'s Ex. 43). That day, Dr. Taylor met with Plaintiff and Ms. Dennis and discussed with Plaintiff both the incident and his decision to place Plaintiff on leave. (Dep. of Dennis at 241, Ex. 3 p. 22). On April 15, 1994, Dr. Taylor notified Plaintiff that his employment had been suspended, and that Dr. Taylor had recommended to the board that Plaintiff's employment be terminated. (Pl.'s Ex. 46).

After an adversarial hearing on July 19, 1994, during which Plaintiff was represented by counsel and was permitted to present witnesses and cross-examine the administration's witnesses, the board voted 5–2 to accept the Superintendent's recommendation that Plaintiff's employment be terminated.[4] (Dep. of L. Coker, at 93). Plaintiff amended his retaliation charge to allege that this termination was also in retaliation for filing a charge of discrimination. (Pl.'s Mem. Opp.Defs.' Mot.Summ.J., Dep.App. II., EEOC Notice of Charge of Discrimination, September 21, 1994). Plaintiff subsequently requested a right to sue letter, and filed an amended summons and complaint on April 3, 1995.

Plaintiff alleges ten causes of action:

(1) Defendants' failure to promote Plaintiff constituted disparate treatment on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq.;

(2) Defendants' failure to promote Plaintiff violated his right to equal protection pursuant to the Fourteenth Amendment and 42 U.S.C. § 1981;

(3) Defendants' failure to promote Plaintiff violated his right to equal protection pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983;

(4) Defendants' termination of Plaintiff's employment constituted a retaliatory discharge in violation of Title VII of the Civil Rights Act, as amended, § 704(a), 42 U.S.C. § 2000e, et. seq.;

(5) Defendants' termination of Plaintiff's employment constituted a violation of Plaintiff's right to freedom of speech guaranteed by the First Amendment, a violation of Plaintiff's right to due process guaranteed by the Fifth and Fourteenth Amendments, and Plaintiff's right to equal protection of the laws guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1981;

(6) Defendants' termination of Plaintiff's employment constituted a violation of Plaintiff's right to freedom of speech, due process, and equal protection of the laws guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1983;

(7) Defendants' conduct constitutes a breach of Plaintiff's continuing contract of employment with the Defendant District in that the provisions of the South Carolina Teacher Employment and Dismissal Act ("SCTEDA"), S.C.Code Ann. §§ 59–25–410 et. seq., are integral terms of Plaintiff's contract of employment with Defendant District;

(8) Defendants, acting under color of state law, unlawfully denied Plaintiff rights afforded by S.C.Code Ann. §§ 59–25–410 et. seq., in violation of Plaintiff's right to due process of law guaranteed by the Fifth and Fourteenth Amendments and by 42 U.S.C. § 1983;

(9) Defendants' termination of Plaintiff's employment constituted a violation of Plaintiff's right to due process under Article 1, Section 3 of the South Carolina Constitution and the Fifth and Fourteenth Amendments of the United States Constitution, in that Plaintiff's status as a continuing contract employee establishes a

---

4. Plaintiff alleges that board members Hampton, Newton, Floyd, and A. Coker were actually biased against Plaintiff and should have been disqualified from hearing and voting on Plaintiff's termination. (Mem.Supp.Pl's Mot.Summ. J. at 11).

reasonable expectation of continuing employment with Defendants; and

(10) Defendants' conduct violated Plaintiff's rights under Article I, Section 22 of the South Carolina Constitution in that Defendants have deprived Plaintiff of liberty and property interests without adherence to the procedures set forth in the South Carolina Teacher Employment and Dismissal Act, S.C.Code Ann. §§ 59–25–410 *et. seq.*

## II. ANALYSIS

### A. Standard of Review

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when there exists no genuine issue as to any material fact and a decision may be rendered as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The facts must be viewed in the light most favorable to the non-moving party so that any doubt as to the existence of a genuine issue of material fact will be resolved in favor of denying the motion. *Adickes,* at 157, 90 S.Ct. at 1608; *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Nevertheless, the motion must be granted if the court is satisfied that no real factual controversy is present, so that the remedy can serve "its salutary purpose in avoiding a useless, expensive, and time consuming trial where there is no genuine, material fact issue to be tried." *Lyons v. Board of Educ.,* 523 F.2d 340, 347 (8th Cir.1975).

### B. Plaintiff's Motion for Summary Judgment

Plaintiff moves for judgment as a matter of law on the following grounds:

(1) Defendants Clarendon County School District Three and Defendant Hampton engaged in an unlawful employment practice in violation of Title VII, because there is no genuine issue of material fact whether race was a motivating factor in Defendants' decision not to promote Plaintiff;

(2) Defendant District and Defendant Hampton *intentionally* engaged in an unlawful employment practice in violation of Title VII, because there is no genuine issue of material fact whether Defendants' decision not to promote Plaintiff was intentionally motivated by Plaintiff's race;

(3) Defendants cannot show that the District would have made the same decision not to promote Plaintiff in the absence of race as a motivating factor;

(4) Defendants violated the Equal Protection Clause and § 1981 and § 1983, because there is no genuine issue of material fact as to whether Plaintiff's race was a motivating or substantial factor in Defendants' decision not to promote Plaintiff, and Defendants would not have made the same decision in the absence of race being a motivating factor;

(5) Defendants have failed to establish the affirmative defense that after-acquired evidence of Plaintiff's misconduct bars Plaintiff's recovery;

(6) Defendants' termination of Plaintiff is no bar to Plaintiff's recovery, because there is no genuine issue of material fact whether, had Plaintiff not been wrongfully denied the promotion, he could not have been dismissed for making direct personal threats to a principal; and

(7) Defendant District and Defendant Taylor unlawfully denied Plaintiff due process of law in violation of the 5th and 14th amendments, § 1983, and the South Carolina Constitution, and deprived Plaintiff of property without adherence to the SCTEDA, because Plaintiff was suspended without notice and opportunity for a hearing, and Plaintiff's pay was terminated without notice and opportunity for a hearing.

### (1) Unlawful Employment Practice Under Title VII

Plaintiff argues that he is entitled to summary judgment on his Title VII claims because there is no genuine issue of material fact that race was a motivating factor in Defendants' decision not to promote Plaintiff. Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ..." Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e-2(a) (1994). Furthermore, "an unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e-2(m).

The complainant in a Title VII case must withstand the initial burden under the statute of establishing a prima facie case of racial discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The burden must then shift to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. When the complaining party demonstrates that race was a motivating factor for any employment practice, the party has established an unlawful employment practice and is entitled to partial attorneys' fees and prospective injunctive relief. Civil Rights Act of 1991 §§ 703(m), 706(g)(2)(B), 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B). The defendant can avoid further liability by proving that it would have made the same decision in the absence of any discriminatory factors. 42 U.S.C. § 2000e-5(g)(2)(B).

Plaintiff argues that this is a case of "direct" evidence of discriminatory motive, so Plaintiff is entitled to the relief set forth in 42 U.S.C. § 2000e-5(g)(2)(B) and the burden has shifted to Defendants to prove that they would have made the same decision in the absence of discriminatory motive. However, this court is not convinced that Plaintiff has shown as a matter of law that race was a motivating factor in Defendants' decision not to promote Plaintiff to principal.

The purpose behind the passage of Title VII was "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823. While clearly Title VII applies on the same terms to discrimination against males or whites, Hicks v. ABT Assocs., 572 F.2d 960 (3rd Cir.1978), where a plaintiff in an employment discrimination case alleges a case of "reverse discrimination," the prima facie case requirements are more onerous. Rather than showing that the plaintiff is a member of a protected class, the plaintiff must establish background circumstances which support the suspicion that the defendant is among those unusual employers who discriminate against the majority. Tatum v. Philip Morris, Inc., 809 F.Supp. 1452 (W.D.Okla.1992), aff'd, 16 F.3d 417 (10th Cir. 1993), cert. denied, —— U.S. ——, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994); Martin–Trigona v. Board of Trustees, 668 F.Supp. 682 (D.D.C.1987); see Murray v. Thistledown Racing Club, Inc., 770 F.2d 63 (6th Cir.1985).

Plaintiff's sole evidence of discriminatory intent is Defendant Hampton's statement that he was not going to vote for two white principals. Defendants have produced evidence that Defendant Hampton made this statement not because of any discriminatory intent, but because he felt that if the board rejected the Superintendent's recommendation of a black candidate for principal, where there were no other black members of the administration and 40% of the student body in the District is black, the board itself would be viewed as racist. The determination of whether Defendants had a racial motivation necessitates a weighing of the parties' credibility, a function to be performed by the fact-finder at trial rather than by the court at the summary judgment stage. See Fed.R.Civ.P. 56.

In the light most favorable to the Defendants, Defendant Hampton voted for Ms. Boston rather than for Plaintiff because Ms. Boston was the candidate recommended by the Superintendent. It was the Board's long-standing practice to vote for the candidate recommended by the Superintendent, and no Board member could remember an instance when the Superintendent's recommendation had *not* been upheld. If the Superintendent had recommended Plaintiff, Defendant Hampton would have voted for him. (Dep. of Hampton, at 54). Defendant Hampton's statement that he was not going to vote for two white principals was motivated by a desire to avoid a racial problem that might have arisen had the board unanimously upheld the Superintendent's recommendation of a white person for principal, but rejected the Superintendent's recommendation of a black person. In this way, Defendant Hampton was not motivated by racial *animus,* but wanted to avoid the appearance that the board was acting in a racist manner. Therefore, in the light most favorable to the Defendants, there is a genuine issue of material fact as to whether Defendants engaged in an unlawful employment practice in violation of Title VII.

This finding disposes of Plaintiff's motion with respect to the Defendants' intentional engagement in an unlawful employment practice and Defendants' violation of Plaintiffs' equal protection rights. This finding also makes it unnecessary for the court to consider Plaintiff's motion with respect to the affirmative defenses that Defendants would not have promoted Plaintiff in the absence of race as a motivating factor, and that after-acquired evidence of Plaintiff's misconduct is a bar to Plaintiff's recovery.

### (2) Due Process Claims

Plaintiff argues that he is entitled to summary judgment on the issue of whether the Defendant District and Defendant Taylor denied Plaintiff due process of law in violation of the 5th and 14th amendments, § 1983, and the South Carolina Constitution, and deprived Plaintiff of property without adherence to the SCTEDA, because Plaintiff was suspended without notice and opportunity for a hearing, and Plaintiff's pay was terminated without notice and opportunity for a hearing. Defendants also move for summary judgment on this issue.

Plaintiff argues that when Dr. Taylor wrote Plaintiff on March 18, 1994, advising Plaintiff that he was being placed on administrative leave, Dr. Taylor failed to notify Plaintiff that he had a right to a hearing before the board upon request within fifteen days as required by S.C.Code Ann. § 59–25–450 (1977). That statute provides that:

Whenever a superintendent has reason to believe that cause exists for the dismissal of a teacher and when he is of the opinion that the immediate suspension of the teacher is necessary to protect the well-being of the children of the district or is necessary to remove substantial and material disruptive influences in the educational process, in the best interest of the children or the district, the superintendent may suspend the teacher without notice or without a hearing. The superintendent shall notify the teacher in writing of the suspension. Such written notice shall include the cause for the suspension *and the fact that a hearing before the board is available to the teacher upon request provided such request is made in writing within fifteen days as prescribed by § 59–25–470.*

S.C.Code Ann. § 59–25–450 (1977). Defendants do not dispute the fact that Dr. Taylor's letter of March 18, 1994 did not contain notice that a hearing before the board was available to Plaintiff. Defendants dispute Plaintiff's contention that this gives rise to any violation of the Due Process Clause.

In *Riccio v. County of Fairfax,* 907 F.2d 1459 (4th Cir.1990), the Fourth Circuit considered the claim of a police officer who contended that his termination violated the Due Process Clause because the police department did not follow procedures outlined by state statute. In rejecting this claim, the court held:

Alleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures,

even when those state-created procedures exceed the amount of process otherwise guaranteed by the Constitution. If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.

*Riccio,* 907 F.2d at 1469. Therefore, it is clear that any violation of § 59–25–450 that would not rise to the level of a federal due process violation may conceivably be presented in state court, but is not cognizable as a federal claim.

▮ This court must then turn to what process is due under a federal standard. In *Riccio,* the court cited the Supreme Court's decision in *Cleveland Bd. of Educ. v. Louder-mill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), which found that a state employee facing termination "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Riccio,* at 1463, *citing Loudermill* at 546, 105 S.Ct. at 1495 (citations omitted). As the Supreme Court noted, "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.*

▮ It is beyond dispute that Plaintiff received these requirements of due process. Plaintiff argues that he was denied due process because he did not receive a hearing immediately after his suspension; but Plaintiff concedes that he received a hearing two months after being suspended, but before being terminated. After Ms. Dennis complained to the Superintendent about Plaintiff's threatening conduct at their March 9, 1994 meeting, the Superintendent met with Plaintiff and Ms. Dennis to discuss the incident. Thereafter, on July 19, 1994, Plaintiff received a full-blown adversarial-type hearing before the Board of Trustees, during which he was represented by counsel and given the opportunity to present witnesses and cross-examine the administration's witnesses. Only then did the board vote to adopt the Superintendent's recommendation that Plaintiff be terminated. Defendants'

procedures did not violate Plaintiff's right to due process under a federal standard.

▮ Plaintiff also argues that he is entitled to judgment as a matter of law that Defendants violated the South Carolina Constitution by failing to follow the requirements of the SCTEDA. Again, the court finds that Plaintiff cannot show any violation of constitutional magnitude. Plaintiff first received a letter from the Superintendent on March 18, 1994, informing Plaintiff that he was being placed on administrative leave *with pay* pending a decision about his continued employment. Plaintiff argues that this letter should have informed him of his right to a hearing before the board pursuant to S.C.Code Ann. § 59–25–450. However, that section deals with the situation where a teacher is to be suspended *without* pay. The teacher is to be given notice of his right to a hearing before the board because once the board approves of his suspension, his pay is terminated. *See* S.C.Code Ann. § 59–25–450 ("The salary of a suspended teacher shall cease as of the date the board sustains the suspension. If sufficient grounds for suspension are not subsequently found, the teacher shall be reinstated without loss of compensation."). Clearly, the opportunity for a hearing before the board is designed to afford the teacher an opportunity to present his case before the board prior to the board's decision resulting in cessation of his pay. In contrast, the March 18, 1994 letter dealt with administrative leave with pay, a situation not addressed in the SCTEDA.

On April 15, 1994, when the Superintendent informed Plaintiff in writing that he was being suspended without pay, Plaintiff was informed of his right to a hearing before the board. Nothing in the SCTEDA suggests that Plaintiff should have been afforded two separate hearings before the board, both immediately after his administrative leave and after his suspension a month later. Therefore, Defendants, rather than Plaintiff, are entitled to summary judgment on Plaintiff's claim that they violated his rights to due process pursuant to the South Carolina Constitution and the United States Constitution.

## C. Defendants' Motion for Judgment as a Matter of Law

### (1) Anti–Retaliation Claims

 In addition to the due process issue, Defendants move for summary judgment on Plaintiff's claim pursuant to the anti-retaliation provisions of Title VII. To make out a prima facie case of retaliatory discharge, Plaintiff must establish three elements: (1) that he engaged in protected activity; (2) that Defendants took adverse employment action against him; and (3) that a causal connection existed between the protected activity and the adverse action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). Once this prima facie case is established, the employer must rebut this showing by "legitimate nonretaliatory reasons for the adverse action." *Id.* After the employer has proffered such reasons, the burden of proof shifts to the Plaintiff "to establish by preponderance of the evidence that the proffered reasons are pretextual." *Id.*

Defendants do not dispute the first two elements of Plaintiff's prima facie case, that Plaintiff engaged in protected activity when he filed his charge of discrimination, and that Defendants took adverse employment action against him when they terminated his employment. Defendants deny, however, that any causal connection existed between the two. Furthermore, Defendants argue that, even assuming Plaintiff has established a prima facie case of retaliation, Defendants have articulated a legitimate non-pretextual reason for Plaintiff's discharge.

 This court finds that, even if Plaintiff can present a prima facie case of retaliation, Defendants have shown legitimate reasons for Plaintiff's discharge. In his letter to Plaintiff dated April 15, 1994, the Superintendent informed Plaintiff that he was being suspended on the following grounds:

> The grounds upon which this action is based include your recent conduct toward your immediate supervisor, Mrs. Connie Dennis, whereby you made direct personal threats toward her in an apparent attempt to intimidate her into refraining from addressing her concerns about your performance as a teacher, and you later attempted to confront her again about the matter in the presence of another teacher. As I understand it, this is not the first occasion that you have expressed an unwillingness to accept direction from Mrs. Dennis as your supervisor. It is also not the first incident where you have acted inappropriately toward or around others, or attempted to threaten and intimidate others. Additionally, it has come to my attention that you recently made inappropriate comments to a member of the Board of Trustees. I have concluded that your conduct has been highly insubordinate and unprofessional and is, at best, indicative of a serious lack of judgment on your part, warranting the termination of your employment pursuant to S.C.Code Ann. 59–25–430 and 440.

(Mem.Supp.Pl.'s Mot.Summ. J., attached as Defs.' Ex. 46). The accusations of Dr. Taylor are substantiated by the record. (*See* Dep. of Dennis, at 209–227; Dep. of Dennis, Ex. 3, at 18–20). The court finds that these reasons are sufficient explanation for Plaintiff's discharge.

 Furthermore, Plaintiff cannot uphold his burden of showing that Defendants' reasons were mere pretext. Plaintiff bears the burden of disproving the legitimate non-discriminatory explanation for his dismissal by showing that "the protected activity in which he engaged was the determining factor in his employer's decision." *Parrott v. Cheney*, 748 F.Supp. 312, 318 (D.Md.1989), *aff'd* 914 F.2d 248 (4th Cir.1990). Plaintiff points to evidence that Dr. Taylor offered to vacate his suspension and withdraw his recommendation that Plaintiff be terminated if Plaintiff dropped his lawsuit and charge of discrimination.[5] In response, Defendants argue that

---

5. Plaintiff cites the following as evidence that Defendants' termination of Plaintiff was in retaliation for protected activity:

Dr. Taylor wrote another letter to [Plaintiff] on April 18, 1994, (Green Deposition, Exhibit 47), which provided in part:

I received a telephone message from you on Friday, April 15, 1994, which I interpreted as a request from you that I provide you with written clarification of the available options I mentioned in my letter to you of April 15, 1994. As you will recall, I had stated in that

the conversation between Plaintiff and Dr. Taylor was simply an attempt by the superintendent to negotiate a settlement under which all unfavorable material would be eliminated from Plaintiff's record and he would be permitted to resign in exchange for dropping all pending claims against the District. Therefore, Defendants assert that the conversation is inadmissible under Fed.R.Evid. 408 as an attempt at settlement.

 This court finds that the conversation between Plaintiff and Dr. Taylor was an effort on the part of the District to settle all claims between the parties, and is thus inadmissible under Fed.R.Evid. 408.[6] Plaintiff is attempting to offer evidence of Defendants' offer of a settlement of all claims between Defendants and Plaintiff as evidence of the validity of Plaintiff's claim. The evidence is neither "otherwise admissible," nor "offered for another purpose." Fed.R.Evid. 408.

All other evidence Plaintiff offers of a causal connection between his filing of a discrimination charge and his subsequent termination are insufficient to withstand Plaintiff's burden of proof. Plaintiff states that he received in his mailbox at school notices of job vacancies in other districts which he learned were sent to him by Ms. Gwen Coker at the direction of Dr. Taylor. (Pl.'s Mem. Opp.Defs.' Mot.Summ. J. at 26, *citing* Dep. of Pl. at 129). But Plaintiff also presents evidence that the reason Dr. Taylor was having job notices sent to Plaintiff was because Dr. Taylor "said he liked [Plaintiff] and he was trying to help [Plaintiff] find a principal's job." (Dep. of Pl. at 131). Contrary to what Plaintiff believes, this evidence does not show that "Dr. Taylor clearly was trying to get rid of [Plaintiff]." (Pl.'s Mem.Opp.Defs.' Mot. Summ.J. at 27).

Plaintiff also argues that Dr. Taylor's investigation into allegations of sexual harassment by Plaintiff was not objective and was carried out solely in retaliation for Plaintiff's protected activity. But Plaintiff acknowledges that Dr. Taylor had a duty to investigate such allegations. (Pl.'s Mem.Opp.Defs.' Mot.Summ.J., at 27). And while Plaintiff argues that he was singled out for investigation of activity that was common among the teachers, Plaintiff has not produced any evidence that similar complaints were filed against anyone else.

Finally, Plaintiff disputes whether his conduct at the March 9, 1994 conference with Ms. Dennis is a legitimate explanation for his dismissal. Rather than denying the truth of Defendants' allegations that Plaintiff threatened Ms. Dennis and acted in an insubordinate manner, Plaintiff tries to argue that discrepancies in the "tenor" of Ms. Dennis'

letter that I was authorized by the Board to cut off your salary, but that I was willing to withhold that action if and until you wished to discuss alternative resolutions to your suspension and termination.
I am willing to consider vacating your suspension, withdrawing my recommendation that your employment be terminated, and continuing your salary for some mutually agreed upon period of time, if you would resign your position with the District and not pursue a hearing before the Board of Trustees. A number of related matters would also need to be discussed and agreed upon. Your record with the District could then be cleared.
On April 20, 1994, [Plaintiff] met with Dr. Taylor. During that conversation, Dr. Taylor explained what he meant in the April 18, 1994 letter by the two sentences: "A number of related matters would also need to be discussed and agreed upon. Your record with the District could then be cleared." January 23, 1996 Affidavit of William Henry Green. Dr. Taylor told [Plaintiff] that [Plaintiff] would have to drop his lawsuit and his charge of

discrimination for retaliation in order to have his record cleared. *Id.*
(Pl.'s Mem.Opp.Defs.' Mot.Summ.J., at 21–22).

6. Fed.R.Evid. 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
Fed.R.Evid. 408 (1984).

diary entry of that day versus the "style" of Ms. Dennis' letter of March 14, 1994 shows that "Dr. Taylor exaggerated the effect of the March 9, 1994 meeting as a pretext for dismissing [Plaintiff]." (Pl.'s Mem. Opp.Defs.' Mot.Summ.J., at 33). The court finds this argument wholly without merit. Defendants are entitled to summary judgment on the issue of whether Defendants' termination of Plaintiff's employment was in retaliation for Plaintiff's filing of his charge.

### (2) Violation of Plaintiff's First Amendment Rights

Defendants move for summary judgment on the claim that Plaintiff's First Amendment rights were violated when Defendants discharged Plaintiff, on the basis that the charge of discrimination does not constitute speech of public concern. Plaintiff argues that the protected speech upon which his claim is based is not the charge of discrimination, but comments he made to a member of the Board of Trustees, mentioned in the letter to Plaintiff from Defendant Taylor dated April 15, 1994. (See supra p. 843).

■ Plaintiff states that the conversation mentioned in Dr. Taylor's letter was between Plaintiff and board member Ben Floyd about Mr. Floyd's election to the District Board, and that Plaintiff understood Dr. Taylor's letter to be a warning· that Plaintiff should not be involved in discussions with board members about school board elections. In his answers to interrogatories, Plaintiff described his statement to Mr. Floyd as, "You wanted it so bad. You got it. I hope you do the right thing." (Pl.'s Answers to Rule 7.04 Interrogatories, at 10). In his January 23, 1996 affidavit, Plaintiff characterizes his statement to Mr. Floyd as, "Congratulations. Now that you got it, I hope you will do the right thing." (Aff. of Pl. ¶ 7).

■ This court finds that Plaintiff has failed to carry his burden of showing that the allegedly protected speech at issue is a matter of public concern. The Supreme Court in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) set forth the requirement in a First Amendment case that the speech in question involve a matter of public rather than private concern. As the Fourth Circuit Court of Appeals stated in Arvinger v. Mayor & City Council of Baltimore, 862 F.2d 75, 79 (4th Cir.1988), "A statement that involves private interests of any kind, and that is otherwise devoid of public concern, is not entitled to protection under the Pickering test." The proper focus must be "whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression." Id., citing Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir.1985), cert. denied 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986).

While Plaintiff argues that the statement in question deserves protection because it involved the election process, this court is convinced otherwise. Plaintiff's statement to Mr. Floyd, whether it was consistent with his first or second version of the event, is merely a personal statement to an acquaintance after his election to the school board, not a comment on the election process. More likely than not, the statement was a sarcastic remark intended to influence Mr. Floyd in his decision with respect to Plaintiff's employment—certainly a personal rather than public concern. Either way, the expression was not one with which the public is likely to be truly concerned. Defendants are entitled to summary judgment on Plaintiff's claim of violation of his First Amendment rights.

### (3) Plaintiff's Substantive Due Process Claim

■ Third, Defendants move for summary judgment on Plaintiff's claim that he was denied substantive due process in that a number of members of the board [7] were actually biased against him in the hearing which

7. In his Motion for Summary Judgment, Plaintiff alleges that four members of the board were actually biased against him: Mr. Hampton, Mr. Newton, Mr. Floyd, and Mr. A. Coker. (Pl.'s Mem.Supp.Mot.Summ.J., at 11). In his opposition to Defendants' Motion for Summary Judgment, Plaintiff only presses his argument with respect to two board members, Mr. Hampton and Mr. Floyd. (Pl.'s Mem.Opp.Defs.' Mot. Summ.J., at 40–41). To the extent that Plaintiff still maintains that Mr. Newton and Mr. Coker were actually biased against him at the hearing, this court finds that Plaintiff has presented insufficient evidence of such bias.

resulted in his dismissal. Plaintiff cites *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), as authority for the proposition that a party to an administrative hearing is entitled a fair trial, free of actual bias on the part of the decisionmaker. It is Plaintiff's burden to show the existence of bias, rather than its mere possibility, and Plaintiff "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464.

▆▆▆▆ Viewing the facts in the light most favorable to the Plaintiff, he cannot withstand his burden of proof. The only evidence Plaintiff offers for the bias of Defendant Hampton is his alleged pecuniary interest in dismissing Plaintiff: that Defendant Hampton was named as a defendant in Plaintiff's lawsuit, and had alleged the affirmative defense of failure to mitigate damages. Even if such a tenuous claim could provide evidence of bias, Defendants point out that failure to mitigate damages had not been asserted at the time of the hearing on July 19, 1994, but was first alleged in Defendants' response to the amended complaint on April 13, 1995. (Defs.' Answer, filed April 13, 1995). As a matter of law, Defendant Hampton's status as a defendant in this lawsuit is not sufficient evidence that he was actually biased at Plaintiff's hearing.

▆▆▆▆ The only evidence Plaintiff offers for the bias of Ben Floyd is that Mr. Floyd was a complainant against Mr. Green.[8] Plaintiff asserts that, "Even though the District agreed that no evidence concerning Mr. Floyd's complaint against Plaintiff would be considered, the probability of fairness [sic] was clearly there." (Pl.'s Mem.Opp.Defs' Mot.Summ. J. at 40). The nebulous concept of "a 'probability' of unfairness" is not sufficient proof of actual bias. The court finds that Defendants are entitled to summary

judgment on Plaintiff's substantive due process claim.

### (4) Qualified Immunity

Defendants Hampton and Taylor move for summary judgment on the issue of whether they are qualifiedly immune from suit and liability. Because this court has already granted Defendants' motion with respect to those issues for which Plaintiff seeks to hold Defendant Taylor individually liable, the court finds that summary judgment should be granted with respect to Defendant Taylor.[9]

▆▆▆▆ Defendant Hampton argues that he too is entitled to qualified immunity from suit for violation of Plaintiff's rights not to be discriminated against on the basis of race. Public officials are entitled to qualified immunity if the right allegedly violated was not at the time "clearly established," or if clearly established, was one that a reasonable person in the official's position could have failed to appreciate would be violated by his conduct. *Mitchell v. Forsyth,* 472 U.S. 511, 535, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985). Defendant does not dispute that the right not to be discriminated against on the basis of race was clearly established at the time of the alleged violation. But Defendant disputes whether a reasonable person in his position would have thought his conduct violated Plaintiff's rights.

▆▆▆▆ Government officials performing discretionary functions are shielded by qualified immunity from civil damages liability, as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The test of qualified immunity is whether the defendant has engaged in conduct that violates "clearly established constitutional rights of which a reason-

---

8. Apparently, Plaintiff is referring to the allegation in Dr. Taylor's letter to Plaintiff of April 15, 1994, that a board member had complained to him about an inappropriate comment made by Plaintiff. *See supra* p. 843. This is the same conversation which is discussed in connection with Plaintiff's First Amendment claim. *See supra* p. 845.

9. Plaintiff asserts that Defendant Taylor is individually liable for (1) violating Plaintiff's anti-retaliation rights; (2) violating Plaintiff's procedural due process rights; and (3) violating Plaintiff's right to free speech pursuant to the First Amendment. (Pl.'s Mem.Opp.Defs.' Mot. Summ.J. at 43–73).

able person would have known." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992), *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

 This court must (1) identify the specific right allegedly violated; (2) determine whether at the time of the alleged violation the right was clearly established; and (3) if so, then determine whether a reasonable person in the defendant's position would have known that doing what he did would violate that right. *Pritchett*, at 312, *citing Harlow*, at 818, 102 S.Ct. at 2738. The third prong "may require factual determinations respecting disputed aspects of that conduct." *Pritchett*, at 312. If there are "genuine issues of historical fact respecting the [official's] conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial." *Id.* at 313.

The specific right alleged to have been violated by Defendant Hampton was Plaintiff's equal protection right as guaranteed by the Fourteenth Amendment and §§ 1981 and 1983 to be free from intentional racial discrimination in his employment. At the time of the alleged violation, this right was clearly established. Defendant Hampton urges this court to find that a reasonable person in his place would not have known that his conduct would violate that right.

 This court finds that there is a genuine issue of material fact whether a reasonable person in Defendant Hampton's position would have known that his conduct would violate Plaintiff's right to equal protection. In the light most favorable to the Plaintiff, Defendant Hampton voted against Plaintiff's promotion to the position of principal because of the fact that Plaintiff is white and the other candidate is black. Whether a reasonable person would have known that voting for a candidate based on the candidate's race is a violation of equal protection is an issue of fact not appropriate for disposal on summary judgment.

### (5) Individual Liability Pursuant to Title VII

Next, Defendants Hampton and Taylor move for summary judgment on the basis that they are not subject to suit under Title VII because they are not Plaintiff's "employers" within Title VII's statutory definition. Again, because this court has disposed of the claims forming the basis of individual liability against Defendant Taylor, the court need not address whether he would otherwise be liable under Title VII.

Plaintiff may pursue his Title VII claims against Defendant Hampton in his individual capacity only if the Defendant is Plaintiff's "employer" within the meaning of Title VII. An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). In *Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir.1989), the Fourth Circuit Court of Appeals construed Title VII's definition of an employer in the contact of a sexual harassment claim to include any person who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing, or conditions of employment. *Id.* at 104.

 Under the rationale of *Paroline*, Defendant Hampton clearly qualifies as Plaintiff's employer. This court need not find that the Defendant has "ultimate authority to hire or fire to qualify as an employer, as long as he or she has significant input into such personnel decisions." *Id.* Because Defendant Hampton is a member of the board who voted on whether Plaintiff would be hired as principal, he had significant input into the decision not to hire Plaintiff.

But Defendant Hampton argues that *Paroline* is not the proper standard today for determining individual liability under Title VII for any claim other than sexual harassment. In *Birkbeck v. Marvel Lighting Co.*, 30 F.3d 507 (4th Cir.), *cert. denied* — U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994) the Fourth Circuit Court of Appeals considered whether an individual could be held liable as an employer for a violation of the Age Discrimination in Employment Act (ADEA), codified at 29 U.S.C. § 621 *et seq.*, which defines "employer" identically to Title

VII. Reasoning that personal liability on supervisors of large businesses "would place a heavy burden on those who routinely make personnel decisions for enterprises employing twenty or more persons," the court found that the inclusion of an employer's agents in § 630(b) is instead "an unremarkable expression of respondeat superior—that discriminatory personnel actions taken by an employer's agent may create liability for the employer." *Id.* at 510. The court noted that "[e]mployer liability ensures that no employee can violate the civil rights law with impunity, a safeguard that has proven sufficient with respect to Title VII, the ADEA's closest statutory kin." *Id.* Thus, the court found that the ADEA limits civil liability to the employer.

The *Birkbeck* court cited with favor the Fifth Circuit decision of *Harvey v. Blake*, 913 F.2d 226, 227–28 (5th Cir.1990), and the Ninth Circuit decision of *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir.1982). In each of those cases, the court of appeals found that under Title VII, 42 U.S.C. § 2000e(b), individuals acting as employer "agents" will be liable in their official capacities only. After citing these cases, the *Birkbeck* court noted in a footnote,

> An employee, however, may not be shielded as an employer's agent in all circumstances. We address here only personnel decision of a plainly delegable character. *See Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989) (disputed issue of fact with respect to personal liability under Title VII in a sexual harassment setting).

*Id.,* at 510 n. 1. *Birkbeck* thus suggests that *Paroline*'s holding only applies to situations in which the individual defendant's conduct is not "of a plainly delegable character."

Other courts facing this issue in the aftermath of *Birkbeck* find that supervisory personnel cannot be held individually liable in

this circuit for an employment decision that allegedly violates Title VII. In *Lane v. David P. Jacobson & Co.*, 880 F.Supp. 1091, 1095–96 (E.D.Va.1995), the district court found that "[a]lthough the holding of the Fourth Circuit was not founded on the Title VII language, the clear implication of the decision in *Birkbeck* was that the Fourth Circuit does not support individual liability for agents of employers under Title VII." Similarly, in *Shoemaker v. Metro Information Servs.*, 910 F.Supp. 259, 265 (E.D.Va. 1996), the court found that "supervisors may be individually liable in Title VII cases where they wield significant control over plaintiffs and their conduct cannot be categorized as a plainly delegable duty." In *Turner v. Randolph County*, 912 F.Supp. 182 (M.D.N.C. 1995), the court considered whether to hold individual defendants liable for sexual harassment pursuant to Title VII. Noting that the Fourth Circuit Court of Appeals' recent decisions were difficult to synthesize, the court suggested that "[t]his may be the case for the Fourth Circuit to reconcile the discrepancy between the *Birkbeck* and *Paroline* definitions of 'employer'." *Id.,* at 185. Without discussing the import of *Birkbeck*'s attempt to distinguish *Paroline*, the court found that the individual defendants could be held liable.[10]

The conduct for which Plaintiff seeks to hold Defendant Hampton individually liable is of a plainly delegable nature. *Birkbeck* did not define what it meant by the term "delegable,"[11] but because *Birkbeck* itself addressed termination of employment, that case suggests that decisions relating to hiring and firing are of a plainly delegable nature. Other courts have found that duties relating to routine employment are of a delegable nature, while other forms of discriminatory treatment or conduct which may be construed as harassment are not delegable.[12]

---

10. The district court quoted *Birkbeck's* footnote distinguishing *Paroline*, and stated, "This distinction appears to be rather narrow when viewed in light of the reasoning applied in *Birkbeck*. The *Birkbeck* definition of "employer" is diametrically opposed to the *Paroline* definition." *Turner,* at 185.

11. A "delegable duty" has been defined as "[a]n obligation which may be performed by another." Black's Law Dictionary 426 (6th ed. 1990).

12. *Compare Stephens v. Kay Management Co.,* 907 F.Supp. 169, 174 (E.D.Va.1995) (the decision to terminate plaintiff's employment is plainly delegable) *with Shoemaker,* 910 F.Supp. at 265 (defendant in sexual harassment suit allegedly acted in a manner that was personally offensive

Because Plaintiff seeks to hold Defendant Hampton liable for his role in rejecting Plaintiff's application for promotion, this court finds that this conduct relates to a routine employment decision and is therefore of a plainly delegable nature. Consequently, Defendant Hampton may not be held individually liable for his conduct.[13]

### (6) Eleventh Amendment Immunity

Next, the Defendant District seeks a finding that it is immune from suit and liability under the Eleventh Amendment. Because Defendant admits that the Eleventh Amendment does not bar suit against a state under Title VII,[14] its motion is limited to immunity from Plaintiff's equal protection claims.

 An unconsenting state is immune from suit brought in federal court by her own citizens as well as those of another state. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). Even when the state is not a named party to the suit, the Eleventh Amendment bars the action if it is "in essence one for the recovery of money from the state." *Edelman,* at 663, 94 S.Ct. at 1356, *quoting Ford Motor Co. v. Department of Treasury of State of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). The Eleventh Amendment does not bar suits against local government entities or local government officials sued in their official capacity. *Gray v. Laws,* 51 F.3d 426, 431 (4th Cir.1995).

 In determining whether a government entity with both state and local characteristics constitutes an "arm of the state" for Eleventh Amendment purposes, the court must look to whether maintenance of the suit will deplete the state treasury or otherwise threaten the state's sovereign "dignity." *Gray,* 51 F.3d at 431, *citing Hess v. Port Auth. Trans–Hudson Corp.,* —— U.S. ——, ——, 115 S.Ct. 394, 406, 130 L.Ed.2d 245 (1994). A finding "that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity in the single state context." *Gray,* at 433. If the state treasury will not be affected by a judgment in this action, "then the availability of immunity for single state entities, as opposed to multistate entities, must be determined by resort to the other relevant considerations referenced by the Court, chief among which are whether the suit will jeopardize 'the integrity retained by [the] State in our federal system,' and whether the state possesses such control over the entity claiming Eleventh Amendment immunity that it can legitimately be considered an 'arm of the state.'" *Gray,* at 434, *citing Hess* at ——, 115 S.Ct. at 400.

 The court finds that Defendants have not shown that liability for this suit will be paid by the state treasury. The Defendants point to the fact that "roughly three-quarters of the District's total revenues come directly from the state," (Defs.' Mot.Summ.J. at 40, *citing* Budget, Combined Statement of Revenues), but concede that any judgment would likely be paid by insurance. Defendants further assert that "the particular insurance fund in question is itself funded through premiums, 40 per cent of which are

---

to plaintiffs, so *Birkbeck's* rejection of liability for an employee who carries out routine, delegable duties does not apply); *cf.* Turner, *912 F.Supp. at 185 (finding that defendants in sexual harassment case may be held individually liable, without discussing the meaning of the term "delegable").*

In *Mitchell v. RJK of Gloucester, Inc.,* 899 F.Supp. 246 (E.D.Va.1995), the district court construed *Birkbeck's* discussion of the *Paroline* exception to non-liability for individuals as follows:

The meaning of this brief footnote is not immediately apparent. The *Birkbeck* court did not elaborate on the point. This court interprets the footnote to mean that decisions that any employee in a supervisory position might make, i.e., hiring, firing, or discipline, may be delegated within the corporation and thus shield an individual from liability under employment discrimination laws. By contrast, *Birkbeck* implies, correctly, that sexual harassment is not "plainly delegable," and thus individual liability can apply in such cases. *Mitchell,* at 248 n. 4.

13. This finding makes it unnecessary for the court to consider Defendants' argument that because Plaintiff did not name the individual defendants in his EEOC charge of discrimination, this court lacks jurisdiction over Plaintiff's Title VII claims against the individual defendants.

14. *See Pandazides v. Virginia Bd. of Educ.,* 13 F.3d 823, 831 (4th Cir.1994).

paid for with state money." (Defs.' Mot. Summ. J. at 42, *citing* Stipulation of Facts, ¶ 7). The insurance fund that will pay any judgment against Defendants is the South Carolina Insurance Reserve Fund.

This court rejected the very same argument in *Nelson v. Strawn*, 897 F.Supp. 252 (D.S.C.1995), *aff'd in part and vacated in part,* 78 F.3d 579 (4th Cir.1996). There, the City of Moncks Corner and one of its police officers argued that they were entitled to Eleventh Amendment immunity because a judgment against them would be paid by the State Insurance Reserve Fund (IRF), and South Carolina pays 41% of the premiums. This court noted that this 41% paid by the State is not *on behalf of* subscribing agencies, but to cover the State's own agencies. *Nelson,* at 257. This court acknowledged that the State, through its management, is responsible for the investment income that the premiums earn for the IRF, that the Fund was initially capitalized with State money, and that the State has twice recapitalized the IRF during financial insolvency. *Id.* Nonetheless, this court found that "[t]hese few links to state funding, however, are far too tenuous to consider the Insurance Reserve Fund 'state funds' for Eleventh Amendment purposes." *Id.*

Plaintiff has presented substantial evidence that most if not all of the state funds provided to Defendant District are designated for specific purposes other than the pay-ment of insurance premiums, and that the District's premiums paid to the IRF are paid out of the District general operating fund from money raised primarily through local taxes and fees. (Pl.'s Mem.Opp.Defs.' Mot. Summ. J. at 86–92, *citing* Stipulation of Facts). Furthermore, Defendants fail to address the provisions of S.C.Code Ann. § 15–78–140 through 150, which require the District to procure insurance to cover tort liability and that such purchase "be funded by participating governmental entities." S.C.Code Ann. § 15–78–150(b). Viewing the facts in the light most favorable to the Plaintiff, a judgment of liability will not be paid by the state treasury, but by local government funds.[15]

Furthermore, Defendants have failed to show that the maintenance of this suit against the District will jeopardize the integrity of the state's sovereignty, or that the state possesses such control over the District that it can be considered an "arm of the state." Rather, this case is not distinguishable from the myriad of cases which have rejected the idea that a county school board is immune from suit based on the Eleventh Amendment.[16] Defendants are not, as a matter of law, entitled to Eleventh Amendment immunity.

### (7) Breach of Contract

Defendants also move for summary judgment with respect to Plaintiff's claim for

---

**15.** This case is readily distinguishable from *Bockes v. Fields,* 999 F.2d 788 (4th Cir.1993), on which Defendants place much reliance. In that case, the court of appeals found that the Board of Social Services and Department of Social Services for Grayson County, Virginia, were state entities for purposes of the Eleventh Amendment. The court noted that both entities subscribed to Virginia's Public Officials Liability Self–Insurance Fund, which maintains a separate trust fund covering liability of subscribing agencies. The Commonwealth pays 80% of the premiums that fund this plan, while the agencies themselves pay only 20%. *Bockes,* 999 F.2d at 790–91. In contrast, Defendants here have not been able to show with particularity that any of the District's insurance premiums are paid with state funds. *See Nelson,* 897 F.Supp. at 257.

**16.** *See, e.g., Missouri v. Jenkins,* 495 U.S. 33, 56, 110 S.Ct. 1651, 1665, 109 L.Ed.2d 31 (1990) (the Eleventh Amendment "does not afford local school boards like KCMSD immunity from suit"); *Mt. Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (record shows local school board is more like a county or city than it is like an arm of the state, so it is not entitled to Eleventh Amendment immunity); *Burt v. Board of Trustees,* 521 F.2d 1201 (4th Cir.1975) (prosecution of civil rights action against school board and its members not barred by the Eleventh Amendment); *United States v. State of South Carolina,* 445 F.Supp. 1094, 1100 n. 5 (D.S.C.1977) (plaintiff-intervenors' claims against the local school boards not barred by the Eleventh Amendment because the relative autonomy of these boards puts them outside the category of agencies that are "alter-egos" of the state); *Adams v. Richland Sch. Dist.,* 412 F.Supp. 647 (D.S.C.1976) (where money damages sought against the county school district would not result in any additional expenditure of public funds from the state treasury, Eleventh Amendment protection unavailable, notwithstanding other factors which might indicate state control over the district).

breach of contract. This court has previously found that Plaintiff cannot show a violation of the SCTEDA. *See supra* text at 841–843. Because Plaintiff has pointed to no other evidence of Defendants' alleged breach of contract, Defendants' motion is granted with respect to that claim.

### (8) Separate Claims for Relief Pursuant to § 1983

Finally, Defendants argue that, to the extent that Plaintiff purports to assert separate claims for relief under 42 U.S.C. § 1983, those causes of action are nonexistent. Because Plaintiff does not assert any substantive rights arising out of § 1983 alone, but only in conjunction with constitutional violations, this court denies Defendants' motion to that effect.

### III. CONCLUSION

For the reasons above, it is therefore,

**ORDERED,** that Plaintiff's Motion for Summary Judgment be **DENIED;** and

**ORDERED,** that Defendants' Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part.

**AND IT IS SO ORDERED.**